IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,333

STATE OF KANSAS,
*Appellee*,

v.

ADAM J. LONGORIA,
*Appellant*.

SYLLABUS BY THE COURT

1.

A constitutional claim that pretrial publicity requires a change of venue can arise in two contexts:  presumed prejudice and actual prejudice.

2.

Courts should presume prejudice requiring a change of venue, even before voir dire, when pretrial publicity is so pervasive and prejudicial that a court cannot expect to find an unbiased jury pool in the community.

3.

In evaluating a claim that presumed prejudice requires a change of venue, a court reviews the seven factors enunciated in *Skilling v. United States*, 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010):  (1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty.

1

4.

Defendants face a high burden under the *Skilling* test—generally a defendant can obtain a change of venue only upon showing that publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob.

5.

An appellate court reviewing a trial court's decision on a motion to change venue because of presumed prejudice applies a mixed standard of review, examining the trial court's findings of fact for substantial competent evidence and the ultimate legal conclusion drawn from the facts—whether to presume prejudice—de novo.

6.

When a party fails to object to the adequacy of the trial court's factual findings relating to a motion to change venue for presumed prejudice, an appellate court assumes that the trial court made the findings necessary to support the court's decision. The appellate court then conducts a de novo review of the *Skilling* factors, rendering a legal conclusion as to whether prejudice should be presumed.

7.

The Sixth Amendment to the United States Constitution does not demand juror ignorance, and a party does not establish presumed prejudice by simply proving there was extensive media coverage.

8.

Under the facts of this case, the defendant supported a motion to change venue by establishing extensive media coverage and a high level of community familiarity with the

case. But the defendant failed to present evidence of a lynch-mob mentality or other circumstances raising a presumption of prejudice that would require a change of venue.

9.

Because actual prejudice is established when voir dire reveals a community-wide sentiment against the defendant, a defendant must request a change of venue after the completion of voir dire to preserve a claim of actual prejudice for appellate review. Absent preservation, the defendant must explain in an appellate brief why the claim should be considered for the first time on appeal.

10.

K.S.A. 22-2616(1) provides that a trial court should transfer venue when the defendant shows so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in the county where the action is pending. The defendant has the burden to show prejudice in the community significant enough that there is a reasonable certainty he or she cannot obtain a fair trial without a venue change.

11.

An appellate court reviews a trial court's decision on a motion to change venue pursuant to K.S.A. 22-2616(1) for an abuse of discretion.

12.

An abuse of discretion can occur in one of three ways—when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision

13.

Factors to be considered on whether a venue change is necessary under K.S.A. 22-2616(1) include: (1) the particular degree to which the publicity circulated throughout the community; (2) the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn.

14.

Under the facts of this case, where some factors weighed in favor of transferring venue under K.S.A. 22-2616(1), some weighed against, and the record does not reveal any difficulties in selecting a jury, the trial court did not abuse its discretion when it denied a motion to change venue.

15.

When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous. The application of this standard consists of two parts. First, an appellate court must determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record. Second, if the trial court erred, the appellate court must conduct a reversibility inquiry. For the error to be reversible, the appellate court must be firmly convinced that the jury would have reached

4

a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.

16.

Under K.S.A. 2013 Supp. 21-5402(d), felony murder is not a lesser included offense of capital murder.

17.

Retroactive application of K.S.A. 2013 Supp. 21-5402(d)'s amendments excluding felony murder as a lesser included offense of capital murder in a capital case does not violate the constitutional prohibition against ex post facto laws.

18.

A jury's verdict of premeditated murder necessarily establishes two factual elements—premeditation and an intent to cause death—that are legally inconsistent with unintentional but reckless second-degree murder. Where substantial competent evidence supports the verdict of premeditated murder and the jury did not convict the defendant on the lesser included offense of intentional second-degree murder, a trial court's failure to instruct on unintentional but reckless second-degree murder can be deemed harmless.

19.

When considering relevance, courts must assess both the evidence's materiality and its probative nature. An appellate court reviews materiality de novo and the probative nature of evidence for an abuse of discretion.

20.

In a capital murder case where the State must prove a victim's identity, a photograph of the victim is probative.

21.

With few exceptions, it is an established rule of law that an admission by a defendant does not prevent the State from presenting separate and independent proof of the fact admitted.

22.

If a party objects to evidence on the grounds it is repetitious, gruesome, or inflammatory, *i.e.*, unduly prejudicial, an appellate court applies an abuse of discretion standard of review.

23.

Evidence is cumulative when it is of the same kind and on the same point, and it is within the trial court's discretion to admit or exclude it.

24.

A party cannot object at trial on one ground and then argue a different ground on appeal.

25.

A presumptive prejudice rule—*i.e.*, a rule that would lead to an automatic reversal—does not apply when a jury is shown a video of an arrest and the jury is informed that the handcuffing of a suspect is standard procedure. Instead, a defendant claiming the video is unduly prejudicial because it shows the defendant in handcuffs must

6

establish that the trial court abused its discretion in determining that the probative value of the video outweighed its prejudicial impact.

26.

Prosecutors may use sarcasm as an occasional rhetorical device. But we caution that it cannot be used in ways that distract the jury from its charge, demean the adversarial trial process, or become unprofessional to the point of jeopardizing a verdict. Sarcasm, when appropriate, should be thoughtfully tailored to specific arguments and evidence; sarcasm should not set the tone of the prosecutor's entire argument or rebuttal.

27.

Allegations of juror misconduct trigger a progressive two-step inquiry to determine if either a mistrial or new trial is warranted: (1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome. An appellate court reviews the trial court's determination of these two issues under an abuse of discretion standard.

28.

Faced with an allegation that a juror held an inappropriate conversation outside of trial, a trial court should usually question the juror allegedly involved in the misconduct.

29.

After a trial court makes factual findings and draws legal conclusions regarding whether a juror committed misconduct by discussing the case with a third party, an appellate court gives a high degree of deference to the trial court's findings concerning the credibility of witnesses and the perceived impact of the allegedly prejudicial event.

30.

When a criminal defendant challenges the sufficiency of evidence, an appellate court must review all the evidence in the light most favorable to the prosecution and determine whether it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Importantly, an appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence.

Appeal from Barton District Court; HANNELORE KITTS, judge. Opinion filed March 6, 2015. Affirmed.

*Reid T. Nelson*, of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  A jury convicted Adam J. Longoria of capital murder, vehicle burglary, and theft. In this direct appeal, Longoria challenges his convictions, raising eight issues:  (1) The trial court erred when it denied his motion for change of venue; (2) the trial court erred in failing to instruct on the lesser included offense of felony murder; (3) the trial court erred in failing to instruct on the lesser included offense of reckless second-degree murder; (4) the trial court erred in admitting a before-death photograph of the victim; (5) the trial court erred in admitting a video of Longoria's arrest; (6) the prosecutor committed misconduct during closing arguments that denied Longoria a fair trial; (7) the trial court erred in failing to declare a mistrial due to juror misconduct; and (8) the State failed to present sufficient evidence to convict him of capital murder.

We hold that Longoria fails to establish reversible trial error and that sufficient evidence supports his convictions of capital murder. Therefore, we affirm Longoria's convictions and sentences.

FACTS AND PROCEDURAL BACKGROUND

In the afternoon of August 24, 2010, Venture Corporation employees discovered the burnt remains of 14-year-old A.D.'s body near Great Bend at an asphalt plant operated by their employer. A.D. had been missing for nearly 3 days, since late night Saturday, August 21, 2010. Forensic evidence suggested A.D.'s body had been at the site for several days. Investigators observed the remnants of unbuttoned shorts, a shirt and bra, and a red ponytail holder on A.D.'s body. These clothes and the soil that surrounded her body tested positive for gasoline. Though fire had charred most of A.D.'s body, it completely consumed her genital and anal area. Yet residue from duct tape remained, leaving a pattern indicating that duct tape had bound A.D.'s legs and covered her mouth and nose. An investigation into A.D.'s murder led to Longoria.

Longoria moved from Texas to Great Bend in May 2010 to live with his internet girlfriend, Eva Brown. Not long after his arrival in Kansas, Longoria threw a birthday party for Brown. The party began around 1 p.m. on July 17, 2010. Around 7 or 8 p.m., a group of younger individuals arrived. The group included A.D. and several of her friends.

Late into the party, 36-year-old Longoria approached A.D., who was sitting next to one of her friends. The friend heard Longoria ask A.D. if she had a boyfriend. A.D. indicated she did but explained that they were broken up at the time. Longoria asked if she would go out with him—he said that if she dated him he would buy her new clothes,

9

a fake ID, and take her out to eat. A.D. appeared disinterested. This did not dissuade Longoria from asking A.D. for her cell phone number, which she gave him.

The party ended between 3:30 and 4 a.m. The record does not disclose whether Longoria and A.D. had other contact during the party. Another of A.D.'s friends testified that sometime after the party, Longoria told him that he had sex with A.D. in his car; the testimony does not pinpoint when the conversation occurred or if Longoria suggested the sex occurred during the party or at some later date.

After the party broke up, Brown's phone—which she allowed Longoria to use because he did not have his own—received a text message: "Hey, this is [A.D.]!!(:" Longoria told Brown that A.D was a 16-year-old girl from the party and that he gave her Brown's cell phone number to make sure she got home safely. Longoria's relationship with A.D. continued through numerous text messages over the month that preceded her murder. At trial, the State pointed to these text messages as evidence of Longoria's sexual intent. The prosecutor also urged the jurors to consider what the messages did not say, pointing out the lack of bravado or other references about having had sex or wanting to repeat sexual acts. Instead, according to the State's argument, the tone of the flirtatious messages conveyed a desire to develop a sexual relationship.

Hours after A.D.'s initial message, Longoria wrote, "Good morning beautifyl and i got ur text." Eight minutes later he texted, "Wake up sleeping beauty." After receiving no response for fourteen minutes, he texted, "Tell me if u get this text." A.D. then replied, "Yeahh."

Longoria thanked her for coming to his party, and he asked if he could take her to a movie. "Okayy," A.D. responded. Longoria proceeded to tell A.D. that she was great and had everything going for her, receiving a "[t]hank you," from A.D. Then Longoria

10

said, "Ur very welcome miss shy." This provoked an "I'm not shy" from A.D., to which Longoria replied, "In sum ways u r and i like that." After a few more messages, Longoria asked for a picture. A.D. sent one. And Longoria responded, "Damn I like." Then he told her that he looked forward to spending some time with her. "Yeahh," A.D. replied.

Four hours later Longoria asked, "What u doing hot stuff?" When he got no reply he sent the same message 6 minutes later. A.D. said, "Nothing you." Longoria said he was just thinking of her. "Ohh," she messaged. He asked if that was good or bad. "Good," A.D. responded. Then he asked A.D. what she thought of him. She said she did not know him but he seemed nice. Longoria said he tried to be and that he hoped she wanted to get to know him. "I do," A.D. replied. Longoria texted, "Damn that is kool. Wouldn't think a girl like u would want 2 have anything with me." When asked why, he explained, "Cause ur hot and awesome and don't see myself ur type or in ur league." Longoria got no response, and he sent the same message again 7 minutes later.

Still getting no response, Longoria asked, "R u ok cause u never repled 2 my text and I dont want 2 b a pest either?" A.D. said that her sister had her phone, and she asked Longoria's age. He replied, "Does it matter?"; and he asked for another picture. A.D. did not send one. Longoria then told A.D. that he was 25, and he asked if he was too old for her. She said that she did not know him and asked when they would party again. Longoria replied, "When do u want 2 and r u going 2 b my date?" Nine minutes later he asked, "U going 2 give me a reply?" and A.D. responded, "We are just friends."

A.D. then messaged "[H]ow about tonight?" and Longoria asked what she wanted to do. A.D. told him, "Party." Longoria asked her to call him, twice; she did not call. Then he asked if he had to pick her up and, "[D]o those guys have 2 go?" presumably referring to her friends who had been with her at Brown's party. A.D. replied with, "What?" Longoria asked again if he had to pick her up and if "them guys got to gn."

11

When A.D. did not respond for 11 minutes, Longoria asked, "R u going 2 reply?" She said yes, and he asked, "Then whats going 2 take place?" A.D. did not respond. About an hour later, Longoria asked, "R we doing anxthing?" Thirteen minutes later, still receiving no response, Longoria texted A.D., "K that's kool and have a god nite." A.D. replied, "K?"

"R u mad at me hot stuff?" was the next message Longoria sent A.D. a couple of days later, on July 20, 2010. He told A.D. that he missed her; he thought that he was not in her league; he thought that it would be best if he left her alone. She replied that he did not have to do that. So he asked to take her out to eat—he would even buy her a drink. A.D. did not respond. Later that evening, Longoria got his own cell phone, and he sent a text to A.D. giving her the new number.

Around this time, A.D. mentioned Longoria to her mother and her sister. She told them that she met him at a party in July, that he was 25 years old, and that he seemed like a nice guy. Her mother and sister reminded her to be careful.

On July 21, 2010, A.D. received a text message from Brown (from the phone that Longoria had been using), asking who she was and if she was related to Longoria. Apparently, Longoria had described A.D. to Brown as his cousin. When A.D. corrected Brown, describing herself as Longoria's friend, Brown told her "well he aint ur friend no more got that. dnt what 2 here u talk 2 him again." A.D. then messaged Longoria, asking who was using his old phone. He said a friend had it. Brown, however, told A.D. that she was Longoria's wife. When confronted in a text, Longoria assured A.D. that Brown was not his wife and that A.D. had nothing to worry about. Then he asked her for another picture. A.D. did not reply.

12

The next day, Longoria texted A.D., asking if she was mad. When A.D. replied "No," Longoria said, "So then u still love me! Lol send me that pic." A.D. asked why, and Longoria told her that he had a new phone "but that is kool never mind and have a good day," to which A.D. responded "you too." Longoria texted, "Dont know why u trippin on me I havent done anything 2 u but that is kool and ill see u around." A.D. said, "I'm not."

The following evening, around 5:30 p.m. on July 23, 2010, Longoria asked A.D. if she wanted to party—he was thinking about renting a limo. A.D. did not respond, but she received a text from Brown around 10 p.m. asking, "U bn talkn 2 my hubby?" A.D. did not reply. And she received the same message again from Brown at 2:06 a.m. on July 24.

A.D. told her sister about the strange text messages she was receiving from Brown and Longoria: "I don't know who this beep is. She's texting me, telling me to leave her husband alone. I don't even know who she is." A.D.'s sister took the cell phone from A.D. and sent a message to Brown at 2:09 a.m.—"Okayy listen her[e] chick I don't know who the hell you are but leave [A.D.] alone she don't want anything to do with you and she has man who she very much loves so erase this god Damn number!!!" A.D. told her family, "[Longoria is] the one that keeps texting me. I don't know why she's so mad at me, because I'm not doing nothing."

Longoria again initiated contact with A.D., texting her on July 26. He asked her what she was doing and if she was mad at him. A.D. did not reply.

At around 9 p.m. on July 31, however, A.D. sent Longoria a text asking if he could give her a ride to a birthday party for her stepsister. Longoria immediately said that he would; he said he would pick her up in 15 minutes, and he asked about her plans for after the party. When she replied that she did not know, Longoria told her that he planned to party. A.D. then told Longoria that she was already at the party and no longer needed a

13

ride. But when asked, she said that Longoria could come there and see her. Longoria again asked her numerous times for a picture; she refused. When Longoria messaged that he would be at the party in 10 minutes, A.D. replied that she had left. Longoria then tried to meet A.D. at a store, but A.D. left the store before he arrived. A little after midnight, Longoria told A.D. to meet him at a park. A.D. never showed. And just before 1 a.m., Brown texted A.D. again, "U better quit txtn & caln my hubby u cn go fnd ur own ride fm ur boyfriend tht u so cald love."

In the afternoon of August 1, 2010, Longoria sent A.D. a message asking what had happened the night before. A.D. told Longoria that his wife had texted her again and that he needed to tell her to stop. Longoria falsely told her that he moved from Brown's house and that A.D. should ignore Brown. On August 4, 2010, Longoria texted A.D. from another new number asking what she was doing and if she wanted to go out for a drink and a cruise. A.D. asked who the message was coming from. When Longoria told her, A.D. texted "ohh." Longoria asked, "Is that an ohh that u dont want 2 talk 2 me?" A.D. replied, "ya." Longoria then asked, "[W]hat did I do 2 u?" A.D. never responded.

Around the time of these messages, A.D. told a friend that she was "freaking out because Longoria kept texting her." The friend told her to ignore the messages.

On August 21, 2010, about a week after A.D. told Longoria she did not want to talk to him, A.D. went school shopping in Wichita with her mother and other family members. They stayed in Wichita until 8 or 8:30 p.m. before heading home. At 9:46 p.m. Longoria sent A.D. a text asking why she was mad at him. She replied, "I'm not." So Longoria asked her if she wanted to party, and he mentioned by name some of her friends who would be there. A.D. said that she was not in town yet but that she would let him know when to pick her up.

14

On the drive back to Great Bend, A.D. called a friend. In the car with her family, A.D. mentioned a party that she wanted to go to if they got back to town in time. She listed two male friends who would pick her up and give her a ride to the party. She made no mention of Longoria.

A.D. returned home from Wichita around 10:15 that night. She changed into a pair of jean shorts, white t-shirt, gray sweatshirt, socks, and tennis shoes. A.D. put a new pink and white giraffe print phone case that she had purchased earlier in the day on her phone. Just before 11 p.m., she texted Longoria her address and told him that she was ready. At 11:01 p.m., A.D. received a text from Longoria—"I'm here."

Before leaving, A.D. went into her mother's bedroom and said, "Bye, love you; see you at 12." Around 11 p.m., neighbors testified that they saw A.D. leaving her house while talking on her phone. She entered a black SUV driven by a male. Phone records show that A.D. had been on the phone with a girlfriend, and the girlfriend testified that A.D. said she was going to a party with the same two young men she had mentioned to her mother. Again, she did not mention Longoria. A.D. also told her girlfriend they were on their way to the girlfriend's house to pick her up, but A.D. never arrived. At 11:33 p.m., the girlfriend sent A.D. a text asking, "[W]here u at?"; A.D. never responded. A.D. did not come home at her curfew. And she never responded to any subsequent texts.

Earlier that same day, August 21, 2010, Longoria went to work at Venture Corporation, which operated the asphalt plant outside of Great Bend. The foreman saw Longoria arrive around 7:30 a.m. in a black Ford Escape, as usual. Longoria went home from work around 10 a.m. after Brown called Venture, at Longoria's request, and falsely reported a family emergency.

15

That evening, Longoria and Brown dropped her children off with her brother and went bowling around 7 p.m. They bowled and drank beer for a couple of hours before going to a restaurant for dinner. Longoria's texting throughout the meal upset Brown, and they left for home around 10:30 p.m. After arriving back at home, Longoria left the house again around 11 p.m.—near the same time that he texted "I'm here" to A.D. He told Brown, however, that he was going to a friend's to look at some pictures.

The investigation revealed no eyewitnesses who saw Longoria or A.D. from 11 p.m. to midnight. Signals from Longoria's phone ended after he sent the text, "I'm here," to A.D., suggesting that he turned off his cell phone. A.D.'s cell phone signal, however, sent signals from west of Great Bend in an area that would be consistent with her heading toward the Venture asphalt plant. Thirty minutes later, around 11:33 p.m., the signal relaying the text from A.D.'s friend's phone to A.D.'s phone (asking where A.D. was) was consistent with the phone heading back into Great Bend from the Venture plant. A.D.'s friend never received a response to that message. The last signal from A.D.'s phone came at 11:40 p.m., when someone either shut off A.D.'s phone or removed its battery. Longoria's phone began receiving signals again at 12:01 a.m.

At 12:07 a.m., video surveillance showed Longoria drive the black Ford Escape up to a gas pump at a convenience store. He was alone. He went into the store and asked the clerk if she had a container for gas. She could not find anything. So Longoria went back to the Escape, found a container in the trash, and purchased $1.37 worth of fuel. He left the store at 12:13 a.m.

Brown testified that when Longoria returned home, he was dirty, smelled like gas, and reported working on a friend's car (the friend later denied this). Longoria changed clothes and then left again; but before he did, Longoria washed the clothes that he had changed out of, which was unusual. Brown sent him a message around 12:30 a.m. saying

16

that she had gotten sick. Shortly thereafter, Longoria called saying that he was on his way home. He returned home around 1 a.m. And around that time he sent a text to A.D.'s phone—"There isn't going 2 b a party never mind." Longoria took a shower and went to bed.

When Brown used the Ford Escape to pick up her children the next morning, it smelled like gasoline. In the afternoon of August 22, 2010, Brown received a text that A.D. was missing with a picture. Brown recognized the missing person as the person she had been texting, so she showed Longoria the message. Longoria said "[h]e didn't know who [A.D.] was."

When Brown finished the laundry that Longoria had started the night before, she noticed some unusual stains on the clothes. She told Longoria that the stains did not come out; he said he would just throw the clothes away. Then Longoria washed the shoes he had worn the night before, and he put the shoelaces into a cup of bleach.

That same day, Longoria called some of A.D.'s male friends, including those that A.D.'s mother and girlfriend thought were going to be at the Saturday night party with A.D. Longoria asked the young men where they had been on Saturday night. When they reported they had been at a party and then at a bar known as Willy J's, Longoria requested that they tell law enforcement officers that he had been with them at Willy J's. Subsequently, he told Brown he had been at Willy J's after he left her at home around 11 p.m.

At work on Monday, August 23, 2010, unprompted, Longoria started talking about A.D.'s disappearance with two different employees, saying that A.D. had shown up to a party at his house one night. Later, when confronted at his house by A.D.'s sister—who had tracked Longoria down by the description of the black SUV that neighbors saw A.D.

17

entering—he said that he never saw A.D. Saturday night. He told A.D.'s sister that he had been at Willy J's on Saturday night. Then—after washing the Escape—Longoria went to A.D.'s house, unannounced, telling the family that he would help them find A.D.

Meanwhile, an investigator arrived at A.D.'s residence. Longoria told him that he had come to the house to help; he had heard that his vehicle was involved, and he wanted to clear that up. He admitted that he had texted A.D. Saturday night, but he said that he had just texted what another man wanted to say because the man did not have his phone. Longoria told the investigator that he did not know A.D.

At some point that same day, Longoria ripped the shirt he had worn Saturday night into several pieces. He told Brown if she loved him enough she would get rid of the pieces. She threw the pieces out of the window as she drove the Escape to pick up cigarettes. And later that day, Longoria again brought up A.D.'s disappearance, unprompted, to a store clerk—a complete stranger. He told the clerk that his friends had used his phone to text A.D., that his wife was friends with A.D., and that he spent Saturday night at Willy J's with his wife for 5 hours.

Longoria went to Oklahoma for work on Tuesday, August 24, 2010, and he texted Brown numerous times asking if police had found A.D.'s body (they had that afternoon, but it is not clear if Brown knew). That night, law enforcement seized the Ford Escape Longoria had been driving.

The next day, Longoria asked a neighbor to give him a ride to Venture. When the neighbor dropped Longoria off, Longoria asked for his check at the payroll department. Shortly after he left the office, a Venture employee discovered that a white Ford Explorer belonging to Venture and a company cell phone were missing. Longoria had been seen looking into various vehicles.

The Kansas Highway Patrol received an attempt-to-locate request that described Venture's Ford Explorer and Longoria; the vehicle was being tracked by the Venture cell phone that Longoria had taken. A highway patrol officer saw a white Explorer in the expected area of travel. The officer followed Longoria, who pulled over even before the officer activated his lights. Consistent with standard procedure for a stolen vehicle, the officer asked Longoria to exit the vehicle at gunpoint. Moments later, other officers arrived and assisted in taking Longoria into custody. Over the defense's objection, the State showed a redacted video of Longoria's arrest to the jury.

The investigation led to several additional pieces of physical evidence that the State used to link Longoria to the crime. First and significantly, a forensic examination of the Escape revealed a stain on the driver's side floor mat, just in front of the seat. The stain contained a mixture of A.D.'s and Longoria's DNA. Testing revealed that Longoria's DNA came from semen and A.D.'s from body fluids—not from touch. Second, after executing a search warrant at Longoria's residence, investigators found gasoline on Longoria's shoes, which were still missing their laces. Third, investigators discovered an AutoZone jug that tested positive for gasoline in a cemetery near the location where A.D.'s body had been found; the jug's proximity to A.D.'s body suggested it easily could have been tossed away after the gasoline in the container had been poured on her body. Fourth, a coordinated search of the roadside ditches between the Venture asphalt plant and Great Bend revealed—in different places—A.D.'s pink and white giraffe print cell phone case, the battery cover, her cell phone, and lastly, the cell phone battery.

Longoria's jury trial began on March 26, 2012. After the State presented evidence, a witness called by Longoria testified that before 1 a.m. on August 22, 2010, she noticed smoke coming from the Venture asphalt plant as she passed it and a dark-colored car leaving the road that led to the plant. Another witness testified that around 2 a.m., he saw

19

three vehicles leaving the road that led to the asphalt plant. And a maintenance worker for the cemetery next to the asphalt plant testified that he did not see the plastic AutoZone jug when he mowed the lawn during the time between A.D.'s disappearance and the discovery of her body. Before the defense rested, A.D.'s girlfriend, who had waited for A.D. to pick her up to go to the party, testified that A.D. did not mention that she was with Longoria when she called and said she was on her way.

Also, through cross-examination and argument, Longoria stressed that a trace amount of unknown male DNA, which was not consistent with Longoria's, was located on one of four swabs from A.D.'s mouth. A forensic expert could not say where the unknown DNA came from. He testified that it was consistent with contamination, manufacturing error of the swab, or even from A.D. sharing a straw with a male earlier in the day. Longoria's defense emphasized that A.D. had mentioned two other men and not Longoria, she had a deteriorating relationship with her boyfriend, and the forensic testing could not pinpoint when the DNA stain had been deposited on the floorboard.

After closing arguments and instructions, the jury found Longoria guilty of capital murder based on criminal sodomy, guilty of capital murder based on aggravated criminal sodomy, and guilty of capital murder based on attempted rape—all in violation of K.S.A. 21-3439(a)(4); vehicle burglary in violation of K.S.A. 21-3715(c); and theft in violation of K.S.A. 21-3701(a)(1). Longoria waived his right to be present at his sentencing. The State elected to have Longoria sentenced for capital murder based on aggravated criminal sodomy, and the trial court imposed consecutive sentences of life in prison without the possibility of parole solely for capital murder based on aggravated criminal sodomy, 17 months in prison for vehicular burglary, and 7 months in prison for theft.

Additional facts will be discussed as relevant to the specific issues raised on appeal.

ANALYSIS

Issue 1: *Did the trial court's refusal to change venue deny Longoria's constitutional right to an impartial jury?*

Longoria argues that pervasive and prejudicial pretrial publicity in Barton County, where Great Bend is located, denied him a trial by a fair and impartial jury, violating his right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. Likewise, he contends that the trial court abused its discretion by refusing to transfer his case to another county under K.S.A. 22-2616(1), which allows for a change of venue.

### 1.1. *Additional Factual and Procedural Background*

Longoria first moved for a change of venue in January 2012, just a few months before trial and approximately 16 months after A.D.'s murder. At a motion hearing, Longoria presented witnesses and a venue study to demonstrate the extensive publicity of his case in Barton County and the impact of that coverage on potential jurors.

The telephone survey conducted at the end of 2011 and the beginning of 2012 of 401 Barton County residents revealed that 97 percent could identify the case with no cueing. Further, 100 percent of the respondents recognized the case after some cueing. Part of the survey included specific perceived knowledge of the case. For example, 69.1 percent of the respondents rated as accurate the statement that "[p]olice have evidence that the defendant previously communicated with the victim by text messages." Moreover, the survey reflected that "over 75 percent of the residents of Barton County believe that the defendant is guilty of the crime he is charged with."

Longoria also provided the court with numerous news stories covering A.D.'s murder and his potential involvement. The articles began with Longoria's arrest for vehicular burglary and continued with reports of the case as it progressed through the trial court. He points out that some of the stories mentioned his criminal history, including charges against him in North Carolina for allegedly calling in bomb threats to an elementary school. In addition, Longoria contended that the media picked up and distributed the prosecution's slant on the evidence because the prosecution did not file its motions under seal; this, he claimed, further prejudiced the community against him.

The trial court denied his motion. Longoria did not renew his motion during the jury selection process or other trial proceedings.

1.2 *Presumed Prejudice*

A constitutional claim that pretrial publicity requires a change of venue can arise in two contexts:  presumed prejudice and actual prejudice. Courts should presume prejudice, even before voir dire, when "'pretrial publicity is so pervasive and prejudicial that [a court] cannot expect to find an unbiased jury pool in the community.'" *State v. Carr*, 300 Kan. 1, 57, 331 P.3d 544 (2014).

In evaluating a claim of presumed prejudice, a court reviews the seven factors enunciated in *Skilling v. United States*, 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010):

> "(1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty." *Carr*, 300 Kan. at 62.

Defendants face a high burden under the *Skilling* test—generally a defendant can obtain a change of venue only upon showing that publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob. 300 Kan. at 62.

In our appellate review of the trial court's decision, we apply a mixed standard of review, examining the trial court's findings of fact for substantial competent evidence and the ultimate legal conclusion drawn from the facts—whether to presume prejudice—de novo. 300 Kan. at 63-64.

In this case, though the parties argued the factors in a hearing on the motion, the trial court denied the motion without providing any explanation. Because Longoria did not object to the adequacy of the trial court's factual findings, we assume that the trial court made the findings necessary to deny the change of venue. See 300 Kan. at 65. Further, in large part, the facts were not disputed, and the dispute centered on the weighing of the *Skilling* factors. Thus, we move to the second step of the analysis and review those factors de novo to determine whether the trial court correctly rejected Longoria's presumptive prejudice arguments.

Turning to the first of the *Skilling* factors for presumed prejudice, Longoria makes no claim that the media interfered with courtroom proceedings. And the record does not reflect any interference. Consequently, this factor weighs against the presumption of prejudice.

As to the second *Skilling* factor—the magnitude and tone of coverage—Longoria argues the media slanted its extensive coverage in the prosecution's favor and reported facts that were inadmissible at trial. But "the Sixth Amendment does not demand juror

23

ignorance"; simply proving extensive media coverage does not establish prejudice, especially where the coverage is factual. 300 Kan. at 65. And the media covered Longoria's case factually—as opposed to inflammatorily—even if its coverage revealed some inadmissible evidence (*i.e.*, Longoria's criminal history). Thus, this factor weighs against the presumption of prejudice. See 300 Kan. at 66 (recognizing that factual coverage, even of inadmissible facts, undermines a presumption of prejudice).

The third *Skilling* factor—the size and characteristics of the community—weighs in favor of presuming prejudice. The jury pool for Longoria's case consisted of 20,546 residents, which is a relatively small population. As the survey indicated, most of the community knew at least something about A.D.'s death, and the population of Barton County was not large enough to diminish the potential that an impartial jury would be impossible to find. Compare *Skilling*, 561 U.S. at 382 (recognizing that communities with millions of residents mitigate the risk that an impartial jury cannot be found), with *Rideau v. Louisiana*, 373 U.S. 723, 724-26, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963) (recognizing greater potential for prejudice in parish with 150,000 residents, where confession broadcast to audience of nearly 100,000 over 3-day period).

The fourth *Skilling* factor relates to the time that elapsed between the crime and the trial. Here, the crime occurred on August 21, 2010, and the trial court ruled on the motion to change venue on March 20, 2012. Generally, public interest wanes over time. *Carr*, 300 Kan. at 68. In this case, the passage of time did not wipe out the survey respondents' memory that the crime had occurred—approximately 97 percent of residents still remembered the case. But that percentage decreased when the surveyors asked about specific details in the case. Given the lack of memory regarding the specifics that might reflect adversely on Longoria, the passage of time results in this factor weighing against presuming prejudice, albeit marginally.

24

The fifth *Skilling* factor focuses on the verdict; but the trial court did not know the verdict at the time it denied Longoria's motion. As such, this factor carries no weight in our review. See 300 Kan. at 68.

The impact of the crime on the community, the sixth *Skilling* factor, weighs in favor of presuming prejudice. See 300 Kan. at 68-69. Hundreds of individuals attended a vigil held for A.D. a week after her death, and Longoria points to comments and social media posts showing strong public sentiment. Moreover, the managing editor of the Great Bend Tribune testified that the Tribune chose to cover the case because of its high public interest.

The seventh and last *Skilling* factor—publicity given to a confession or other "smoking-gun type of information"—does not apply here because Longoria did not confess and no direct evidence exists of Longoria's guilt. See 300 Kan. at 69-70.

In sum, Longoria established extensive media coverage and a high level of community familiarity. But he must show more to give rise to a presumption that he would not receive a fair trial. He must present evidence of a lynch-mob mentality, and he failed to do so. 300 Kan. at 72. Based on our de novo review, we conclude that the *Skilling* factors, given appropriate weight, did not compel the trial court to presume prejudice.

1.3 *Actual Prejudice*

Longoria briefly raises an actual prejudice argument. Actual prejudice occurs when "'the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.'" *Carr*, 300 Kan. at 57 (citing *Goss v. Nelson*, 439 F.3d 621, 628 [10th Cir. 2006]). When faced with a claim of actual prejudice, a trial court must "review

25

the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. Negative media coverage by itself is insufficient to establish actual prejudice." *Carr*, 300 Kan. 1, Syl. ¶ 6.

But here, Longoria never renewed his motion to change venue after voir dire to claim that voir dire revealed actual prejudice. Consequently, the trial court did not render a decision that this court can review. See *State v. Johnson*, 293 Kan. 959, 963-64, 270 P.3d 1135 (2012) ("We generally refuse to consider an issue on appeal if it has not been raised in the district court."). Moreover, Longoria fails to explain why this court should consider this issue for the first time on appeal. See Supreme Court Rule 6.02(a)(5) (2014 Kan. Ct. R. Annot. 41) ("there must be an explanation why the issue is properly before the court" if it was not raised below).

Simply put, Longoria failed to preserve this issue for appellate review.

1.4 *Statutory Prejudice*

Longoria preserved an alternative argument, however, and on appeal asserts that the trial court erred in applying K.S.A. 22-2616(1) and refusing to transfer his case to another venue for trial. K.S.A. 22-2616(1) provides that a trial court should transfer venue when the defendant shows "so great a prejudice against the defendant that he [or she] cannot obtain a fair and impartial trial in that county." The defendant has the burden to show prejudice in the community significant enough that there is a reasonable certainty he or she cannot obtain a fair trial without a venue change. See *State v. McBroom*, 299 Kan. 731, 746, 325 P.3d 1174 (2014).

This court reviews the trial court's decision on a motion to change venue pursuant to K.S.A. 22-2616(1) for an abuse of discretion. *Carr*, 300 Kan. at 80-81. An abuse of

discretion can occur in one of three ways—when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Here, Longoria does not dispute the legal standard applied by the trial court or argue that the evidence did not support any of the court's findings. Rather, Longoria argues the unreasonableness of the trial court's determination.

Indeed, the trial court applied the correct legal standard—a nine-factor test this court recently reiterated:

> "Factors to be considered on whether a venue change is necessary under the Kansas statute include: (1) the particular degree to which the publicity circulated throughout the community; (2) the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn." *Carr*, 300 Kan. 81, Syl. ¶ 10.

Here, four factors weigh in favor of changing venue. As noted previously, Longoria's case received significant publicity; thus, factor one weighs in his favor. Likewise, considering factor five, a significant portion of the public reported an awareness of the case: 97 percent of those polled recognized the case without cueing, and a few prospective jurors revealed strong opinions of guilt. Applying factor eight, the severity of the offense, Kansas does not recognize a higher severity level than capital murder, which is potentially punishable by death. See K.S.A. 21-3439; K.S.A. 21-4624(a). And, considering factor nine relating to the size of the community, a population

of 20,546 eligible jurors provided a relatively small pool from which to draw the venire panel.

At least one factor—factor two relating to the degree of media coverage outside Barton County—could be assessed as neutral. While local media covered the case extensively, media outside the community also reported on the crime and the court proceedings. Although other communities probably did not feel the same impact, the defense did not conduct a survey of other venues to determine the effect of pretrial publicity. Hence, the trial court lacked evidence on which to fully assess this factor.

Factors three, four, and six weigh against a transfer of venue. Regarding factor three and lapse of time, as established, 19 months had passed between the crime and the trial, and voir dire suggested that public interest decreased with time (during voir dire, defense counsel wondered if streaming coverage of prior hearings was worth the media's time considering that no potential juror had even seen it). As to factor four, the care used in selecting a jury and the ease of selecting the jury, the trial court utilized juror questionnaires and individual voir dire, both of which encouraged candor. The record does not reflect difficulty in finding an unbiased jury. The State and the defense passed 44 potential jurors after voir dire, ultimately selecting 14 jurors from the panel. Each of the jurors, even those that had heard about the case, expressed their ability to impartially view the case in light of the evidence at trial. Only in extreme cases does this court second-guess jurors' assurances of impartiality. *Carr*, 300 Kan. at 76-77 (citing *Irvin v. Dowd*, 366 U.S. 717, 727-28, 81 S. Ct. 1639, 6 L. Ed. 2d 751 [1961]) (recognizing extreme case where 268 of 430 potential jurors were excused after expressing immovable opinions on the defendant's guilt). The record does not reveal anything extreme about Longoria's case. And, as to the utilization of juror challenges and factor six, Longoria points to nothing in the record reflecting that a later sworn juror harbored any bias towards him or maintained a strongly held pretrial opinion of the case. Ultimately,

28

Longoria received a 14-member jury that had neither expressed, nor appears to have harbored, bias against him.

Longoria focuses most of his appellate arguments on factor seven—the connection of government officials with the release of publicity. He attempts to hold the prosecution responsible for the publicity he deems inappropriate because it did not file all of its motions under seal; thus, according to Longoria, the prosecution enabled the media to disclose information that would not be admitted at trial. He cites no authority that required the prosecution to file its motions under seal. To the contrary, "members of the public have a right of access to criminal proceedings secured by the First Amendment." *Tennessee v. Lane*, 541 U.S. 509, 523, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004). The trial court did not order a seal on any documents or issue any other order restricting public filings. Further, the trial court did not find any violations of its orders or determine there had been prosecutorial misconduct. Thus, we find no basis in the record for determining that the prosecution filed motions or supporting memoranda for the purpose of causing prejudice.

After considering the factors together—some weighing in favor of transferring venue and some against—we conclude other reasonable judges might have denied Longoria's motion to change venue under the statute. Significantly, the record does not reveal any difficulties in selecting a jury in this case. See *McBroom*, 299 Kan. 731, Syl. ¶ 4 (recognizing precedent finding no abuse of discretion when hindsight revealed no undue difficulty selecting a jury). Thus, the trial court did not abuse its discretion when it denied Longoria's motion to change venue.

Issue 2: *Did the trial court err in failing to instruct the jury on felony murder as a lesser included offense of capital murder?*

Longoria argues that the trial court erred in failing to *sua sponte* instruct the jury on felony murder as a lesser included offense of capital murder.

When, as here, a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous. The application of this standard consists of two parts. First, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). Second, if the trial court erred, the reviewing court must conduct a reversibility inquiry. For the error to be reversible, the reviewing court must be "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." 295 Kan. 506, Syl. ¶ 5.

Regarding whether there was error, at the time Longoria filed his appellate brief in this case a felony-murder instruction would have been legally appropriate. See *State v. Mireles*, 297 Kan. 339, 363-65, 301 P.3d 677 (2013) (finding a felony-murder instruction as a lesser included offense of capital murder was legally and factually appropriate); *State v. Cheever*, 295 Kan. 229, 259, 284 P.3d 1007 (2012) ("felony murder is a lesser included crime of capital murder" under K.S.A. 2011 Supp. 21-5109[b][1] because felony murder is a lesser degree of homicide than capital murder), *vacated on other grounds and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

But before the State filed its brief, the Kansas Legislature in amendments made in K.S.A. 2013 Supp. 21-5402(d) provided that felony murder is not a lesser included offense of capital murder. Further, the legislature declared that the 2013 amendments made in K.S.A. 2013 Supp. 21-5402 "establish a procedural rule for the conduct of criminal prosecutions and shall be construed and applied retroactively to all cases currently pending." K.S.A. 2013 Supp. 21-5402(e).

In his reply brief, Longoria argues that the retroactive application of the amended statute violates the constitutional prohibition against ex post facto laws. See United States Constitution, art. 1, § 9 ("No Bill of Attainder or ex post facto Law shall be passed."); United States Constitution, art. I, § 10 ("No State shall . . . pass any . . . ex post facto Law."). Longoria does not challenge the amended statute's constitutionality under his right to due process.

Subsequently, in *State v. Gleason*, 299 Kan. 1127, Syl. ¶ 10, 329 P.3d 1102 (2014), this court held that the provision of K.S.A. 2013 Supp. 21-5402 that excludes felony murder as a lesser included offense of capital murder applies retroactively and does not violate the Ex Post Facto Clause. Thus, even if the trial court erred in this case by not giving a felony-murder instruction, and we reversed Longoria's conviction and remanded the case for a new trial, Longoria would not be entitled on remand to the felony-murder instruction. Accordingly, while Longoria may be correct in his assertion that the trial court erred, he is not entitled to the relief he requests—a new trial during which the jury would receive a felony-murder instruction.

Issue 3:  *Did the trial court err in failing to instruct the jury on unintentional but reckless second-degree murder as a lesser included offense of capital murder?*

Next, Longoria argues that it was clear error not to instruct on a lesser included offense of unintentional but reckless second-degree murder. The trial court instructed the

jury on capital murder and its lesser included offenses of premeditated first-degree murder and one of two types of second-degree murder. One type of second-degree murder—the one instructed upon in this case—occurs if the murder is committed *intentionally*. The second—the one not instructed upon nor requested by Longoria— occurs if the murder is committed "*unintentionally* but recklessly under circumstances manifesting extreme indifference to the value of human life." (Emphasis added.) K.S.A. 21-3402(b). This court has explained that unintentional but reckless second-degree murder is a killing that is not purposeful, willful, or knowing but rather results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen. *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012).

The parties do not dispute the legal appropriateness of an unintentional but reckless second-degree murder instruction. They focus on whether the instruction would have been factually appropriate and on whether, if appropriate, it was clear error to not give the instruction. We need not burden this opinion with the various points each party makes about whether the instruction was factually appropriate because Longoria fails to firmly convince us the jury would have found that Longoria acted unintentionally with mere recklessness. See *Williams*, 295 Kan. 506, Syl. ¶ 5 (stating reversibility standard). Several considerations weigh against Longoria's position.

First, substantial circumstantial evidence supports the jury's conclusion that Longoria acted intentionally. See *State v. Cheffen*, 297 Kan. 689, 704, 303 P.3d 1261 (2013) ("intent to kill can be inferred from acts, circumstances, and inferences reasonably deducible therefrom"), *superseded by statute on other grounds by* K.S.A. 2013 Supp. 21-5109(b)(1) (no lesser offenses to felony murder). The circumstantial evidence strongly suggested that Longoria drove A.D. to a remote location and disabled her cell phone. Most significantly, the coroner and other investigators viewing the duct tape residue concluded that Longoria taped A.D.'s mouth and nose, with the taping pattern suggesting

32

he left no hole—no airway. He then took steps to conceal his crime—burning her body; washing his clothes; and attempting to plant alibi evidence with many people, including strangers, before fleeing.

Second, not only does this circumstantial evidence strongly support a conclusion that Longoria intended to kill A.D., it also suggests that he premeditated the murder. See *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 (2014) (factors that give rise to an inference of premeditation include "[1] the nature of the weapon used; [2] lack of provocation; [3] the defendant's conduct before and after the killing; [4] threats and declarations of the defendant before and during the occurrence; and [5] the dealing of lethal blows after the deceased was felled and rendered helpless"). Indeed, the jury's guilty verdict indicates that the jurors were unanimously convinced beyond a reasonable doubt that Longoria not only intended to kill A.D. but that he premeditated her murder. Although Longoria attacks the sufficiency of the evidence relating to some elements of capital murder (see issue 8 below), he does not assert that the evidence of premeditation was insufficient. The jury's verdict necessarily establishes two factual elements— premeditation and an intent to cause death—that would be legally inconsistent with unintentional but reckless second-degree murder. See *State v. Scaife*, 286 Kan. 614, Syl. ¶ 1, 186 P.3d 755 (2008) ("Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act.").

The logical inconsistency of the jury's verdict with unintentional second-degree murder brings the so-called "skip rule" into play. The skip rule "'is not really a rule at all in the sense that it must be invariably or even routinely applied . . . . It is, rather, simply a logical deduction that may be drawn from jury verdicts in certain cases.'" *State v. Plummer*, 295 Kan. 156, 169, 283 P.3d 202 (2012) (quoting and affirming *State v. Plummer*, 45 Kan. App. 2d 700, 711, 251 P.3d 102 [2011]). Those certain cases are ones in which "the elements of the crime of conviction, as compared to a rejected lesser

33

included offense, necessarily show that the jury would have rejected or eliminated an even lesser offense." 295 Kan. at 169. When these circumstances exist, the skip rule provides "a route to harmlessness." 295 Kan. at 169.

That route can be followed here. The jury verdict reflects that the jury was convinced beyond a reasonable doubt that Longoria premeditated the killing of A.D. Had it not been convinced of that element, it could have convicted him of the lesser included crime of intentional second-degree murder. But it was convinced beyond a reasonable doubt that the murder was premeditated, a conclusion that is inconsistent with a conclusion that the murder resulted from recklessness. See *State v. Engelhardt*, 280 Kan. 113, 136, 119 P.3d 1148 (2005) (skip rule applied to hold no clear error in failing to instruct on unintentional second-degree murder where jury had been instructed on lesser included offense of intentional second-degree murder but convicted defendant of greater offense of first-degree murder).

Longoria fails to firmly convince us that the verdict would have been different had the trial court given an instruction on unintentional but reckless second-degree murder as a lesser included offense of capital murder.

Issue 4: *Did the trial court err in admitting a before-death photograph of A.D.?*

Over Longoria's objection, the trial court admitted a before-death photograph of A.D. On appeal, Longoria claims the court abused its discretion in admitting the photograph because it lacked relevancy and merely allowed the State to show the jury a "lovely photograph of a young girl, and thereby generate sympathy and prejudice in the minds of the jurors." Longoria discounts the State's articulated purpose of admitting the photograph—A.D.'s identification—because after the first trial witness, A.D.'s mother,

34

testified that the exhibit was a fair and accurate depiction of A.D., the State did not ask other witnesses to identify A.D. by referencing the photograph.

Thus, Longoria presents a two-prong attack, arguing the trial court erred in ruling that (1) the photograph was relevant and (2) its probative value outweighed its prejudicial nature.

4.1 *Relevance of A.D.'s Photograph*

When considering relevance, courts must assess both the evidence's materiality and its probative nature. K.S.A. 60-401(b); *State v. Stafford*, 296 Kan. 25, 43, 290 P.3d 562 (2012). This court reviews materiality de novo and the probative nature of evidence for an abuse of discretion. *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 (2013).

As to the photograph's probative nature, in Kansas, "photographs may be admitted for purposes of identifying the victim." *State v. Crum*, 286 Kan. 145, 159-60, 184 P.3d 222 (2008); see *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 (2009). For example, in *State v. Ackward*, 281 Kan. 2, 26-27, 128 P.3d 382 (2006), the defendant argued that the trial court abused its discretion in admitting a photograph of the victim taken the night before his death because it was irrelevant and unduly prejudicial. Relying on *State v. Hebert*, 277 Kan. 61, 100-03, 82 P.3d 470 (2004), this court concluded that the State had to prove beyond a reasonable doubt the victim's identity, and the photograph was probative because it assisted in doing so. 281 Kan. at 27; see, *e.g.*, *State v. Cordray*, 277 Kan. 43, 59, 82 P.3d 503 (2004) (holding trial court did not abuse its discretion in admitting the before-death photograph of the victim; photograph relevant to identify the victim and show the extent of his wounds); *State v. Walker*, 252 Kan. 279, 287, 845 P.2d 1 (1993) (finding trial court did not abuse its discretion when "[t]he studio photograph taken in life shows how the victim appeared before the attack rendered her virtually

unrecognizable"). Contrary to Longoria's argument, the photograph's probative value did not depend on its repeated display to various witnesses. A.D.'s mother provided testimony laying a foundation for the photograph's admission, and that testimony combined with forensic evidence established identity.

Longoria principally argues about the photograph's materiality, however. In doing so he focuses on the oft-repeated statement that evidence is material when "the fact at issue has a legitimate and effective bearing on the decision of the case and is in dispute." *Stafford*, 296 Kan. at 43. In particular, Longoria emphasizes the phrase "in dispute" and argues the photograph lacked materiality because the parties stipulated that the "body found at the Venture Asphalt Plant in Barton County, Kansas, on August 24, 2010, was [A.D.]."

His argument fails because "[w]ith few exceptions, '[i]t is an established rule of law that an admission by a defendant does not prevent the state from presenting separate and independent proof of the fact admitted.'" *Hebert*, 277 Kan. at 101 (quoting *State v. Johnson*, 216 Kan. 445, 448, 532 P.2d 1325 [1975]). "The State has the burden of proving all elements of the crime charged, and photographs used to prove the elements of the crime . . . are relevant and admissible." *Riojas*, 288 Kan. at 387; *State v. Gholston*, 272 Kan. 601, 613, 35 P.3d 868 (2001). In essence, given that Longoria did not plead guilty, all elements of the charged crimes remained "in dispute"; his stipulation merely means he did not intend to contest the State's evidence on that particular point of dispute—*i.e.*, that particular aspect of the State's burden.

Therefore, the before-death photograph was material and probative—it was relevant.

### 4.2 *Photograph Not Unduly Prejudicial*

Longoria also argues, however, that the trial court abused its discretion in finding that the photograph was not unduly prejudicial. If a party objects to evidence on the grounds it is repetitious, gruesome, or inflammatory—unduly prejudicial—an appellate court applies an abuse of discretion standard of review. *State v. Soto*, 299 Kan. 102, 112, 322 P.3d 334 (2014); see *Crum*, 286 Kan. at 159-60 ("The trial court has broad discretion regarding the admission of demonstrative photographs."). Of the three forms for an abuse of discretion, Longoria's arguments appear to be that the trial court's decision was arbitrary, fanciful, or unreasonable. *Ward*, 292 Kan. at 550 (explaining that abuse of discretion can occur in one of three ways—when the trial court makes an error of law; bases its decision on facts not supported by substantial competent evidence; or makes an arbitrary, fanciful, or unreasonable decision).

In arguing the unreasonableness of the trial court's decision, Longoria suggests the photograph undoubtedly generated sympathy in the minds of the jurors. Beyond making this suggestion, Longoria fails to specify the basis for his claim of prejudice. Regardless, this court has recognized that a before-death photograph results in minimal prejudice when, as in this case, the photograph is shown only once and not accompanied by any inflammatory personal details about the victim. Minimal prejudice is not undue prejudice. See *Ackward*, 281 Kan. at 27; *Hebert*, 277 Kan. at 103.

Considering the relevance to A.D.'s identity and the minimal prejudice from the photograph, we hold the trial court did not abuse its discretion in admitting the photograph into evidence.

Issue 5:  *Did the trial court err in admitting the video of Longoria being taken into custody at gunpoint?*

Next, Longoria argues the trial court erred in admitting the dash-cam video of his arrest. First, he asserts the video lacks relevance. Second, he contends that it violated the presumption of innocence guaranteed by the Due Process Clause of the United States Constitution.

In the redacted arrest video, Longoria pulled the Venture vehicle over, and the highway patrol officer ordered him to throw the keys out of the window and exit the vehicle. The officer then ordered Longoria to walk backwards to him, get on his knees, and put his hands behind his head. Two officers then approached; one had a weapon drawn but not pointed while another handcuffed Longoria, who was then escorted back to the highway patrol car.

Longoria claims the video of his arrest was not material or probative—*i.e.*, not relevant—because other eyewitnesses established that he took the Venture vehicle. Properly characterized, Longoria argues that the evidence was cumulative. Evidence is cumulative when it is of the same kind and on the same point, and it is within the trial court's discretion to admit or exclude it. *State v. Rodriguez*, 295 Kan. 1146, 1157-58, 289 P.3d 85 (2012); *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996) ("Cumulative evidence in itself is not objectionable."). But Longoria never argued that the video was cumulative before the trial court; he only objected to the video as being unduly prejudicial. And a party cannot object at trial on one ground and then argue a different ground on appeal. *State v. Breedlove*, 295 Kan. 481, 490, 286 P.3d 1123 (2012). Consequently, Longoria failed to preserve his threshold relevance argument.

As to undue prejudice, Longoria argues that similar to a defendant showing up to trial in handcuffs, the video depicting his arrest violated his presumption of innocence.

As support for his request for reversal, Longoria cites a case from West Virginia, *State v. Carey*, 210 W. Va. 651, 657-59, 558 S.E.2d 650 (2001), in which the court cautioned "trial courts in the strongest possible terms to avoid allowing jurors to see a defendant in shackles—whether in the flesh, in photographs, or by any other method." In *Carey*, the defendant left his shoes at the scene of a homicide. A photograph of the defendant taken after his arrest depicted him without shoes but in shackles. Despite its best-practices advice to trial courts, the court in *Carey* found no basis to reverse the verdict, relying on a prior West Virginia case that had rejected automatic reversal in similar circumstances. 210 W. Va. at 658 (citing *State v. Brewster*, 164 W. Va. 173, 261 S.E.2d 77 [1979]).

This court has also rejected automatic reversal in situations similar to this case and has instead examined whether the trial court abused its discretion when weighing the probative value of evidence against its prejudice. In doing so, this court has distinguished cases requiring automatic reversal because of a due process violation. For example, *State v. Dixon*, 289 Kan. 46, 209 P.3d 675 (2009), stated the rule for automatic reversal, holding that routine restraint of a defendant before the jury—absent specific justification—establishes a presumed due process violation without any showing of actual prejudice. 289 Kan. at 58-59 (quoting *Deck v. Missouri*, 544 U.S. 622, 635, 125 S. Ct. 2007, 161 L. Ed. 2d 953 [2005]). But the *Dixon* court distinguished courtroom situations from those where jurors observed a handcuffed or shackled defendant *outside* the courtroom, noting that the "[s]hackling of a defendant while in transit through a public hallway is entirely different from shackling at the defense table during a jury trial. We think it highly unlikely that any juror in a double homicide case would be shocked or, for that matter, improperly influenced merely because the accused is transported securely." 289 Kan. at 61.

This case presents us with a similar out-of-courtroom situation. Moreover, immediately prior to the arrest video being played to the jury, the highway patrolman

39

explained the video would show him following the standard procedure used when an officer "know[s] that . . . there's felony charges that *could* be brought." (Emphasis added.) These procedures include "order[ing] the occupants out of the vehicle at gunpoint, and . . . securing[ing] them . . . in order to eliminate any harm to the public." Thus, the jurors understood that officers deemed Longoria a *suspect* facing potential charges—a concept consistent with the Due Process Clause's presumption of innocence. Hence, we conclude the presumptive prejudice rule—the rule that would lead to an automatic reversal—does not apply. Longoria must therefore establish that the trial court abused its discretion in determining that the probative value of the video outweighed its prejudicial impact.

As to this weighing, although largely cumulative of the officer's testimony to which Longoria did not object, the video had probative value. First, it confirmed that Longoria drove the Venture vehicle—indeed, that he was the sole occupant. Second, because Longoria pulled over even before the officer activated the emergency lights, the jurors could infer a guilty conscience. While the video shows Longoria being arrested and handcuffed, this information had already been relayed through testimony. Furthermore, the video of Longoria's arrest was neither so shocking nor so improperly prejudicial that it unduly influenced the jury. We, therefore, conclude the trial court did not rule unreasonably in admitting the video.

Longoria fails to establish error.

Issue 6:  *Did the prosecutor commit misconduct during rebuttal arguments that prejudiced the jury against Longoria and denied him a fair trial?*

Longoria next contends that the prosecutor committed reversible misconduct during rebuttal argument. He complains of several passages, but he makes one general challenge:  "The prosecutor's sarcasm converted the argument from one that was based on

facts adduced at trial into argument based on the prosecutor's personal belief and opinion."

6.1 *The Prosecutor's Arguments*

All the statements that Longoria challenges occurred during the prosecutor's rebuttal argument. While that does not excuse misconduct, the defense counsel's closing arguments provide context for the State's rebuttal statements. See *State v. Marshall*, 294 Kan. 850, 860-61, 281 P.3d 1112 (2012) (defendants do not open the door to prosecutorial misconduct, but rebuttal nature of prosecutor's arguments is a factor to be considered by appellate court). Throughout the defense counsel's closing, he attempted to shift the jury's focus from Longoria to A.D.'s friends. He directed the jury's attention to the two young men that A.D. identified as giving her a ride to the Saturday night party, the party that never happened. Defense counsel questioned why law enforcement officers had not investigated the two further, emphasizing that one of the men hung his head and said that something "probably" happened to A.D. when initially confronted by A.D.'s sister. He also focused on A.D.'s deteriorating relationship with her boyfriend, as revealed by text messages between them. At one point, the defense counsel questioned why the State had highlighted Longoria's text messages through demonstrative exhibits but had not displayed those of others with whom she had conflicts.

In response to defense counsel's comments, the prosecutor pointed out that the trial court had admitted *all* of A.D.'s text messages, including those between A.D. and her boyfriend and her other friends. The prosecutor invited the jurors to read the text messages if they wanted to better understand all the problems a 14-year-old girl had with her friends. After summarizing some of the inconsequential messages contained in the exhibit, the prosecutor added:  "Maybe one of her teenage girlfriends killed her because they were mad about what she did at cheerleading practice. Maybe that happened too.

41

Maybe she was abducted by a UFO and taped up." The prosecutor then suggested that the juror's common sense would tell them that A.D. had lied to her mother "because if she would have told her she was leaving with [Longoria], she wouldn't have got to go."

The prosecutor added: "And [her friend] killed her because he hung his head? He was a friend. *Come on with the* [*friend*]. *Seriously*." (Emphasis indicating challenged statements.) The prosecutor next reviewed the timeline, noting that it was Longoria who told A.D. he would "[b]e [t]here in three minutes, asking for her address, driving what car. Did he loan that car to [A.D.'s friend] in that short little time period, and why is he saying 'I'm here' if it was [A.D.'s friend] *or a mystery man or an alien or whatever it might be*. It's Adam Longoria saying 'I'm here.'" (Emphasis indicating challenged statements.)

Defense had also questioned why witnesses who reported seeing vehicles in the area of the Venture plant in the early morning hours after A.D.'s disappearance did not mention a black Ford Escape. In response, the prosecutor stated in part:

> "And this discussion of driving down the road at 65 miles per hour and seeing people leaving the county road, folks. Which carload was it? *Was it the Cavalier that left at 12:30, or was it the Ford that left at 2:30, or maybe it's the heat waves at 8:00 the next day? What is it? Or no, you know whose fault it is? It's the Great Bend Police Department's fault.* That's what it is. It's his fault. And the evidence establishes that. It is his fault, and they can talk and have you look in different directions, but you need not look anywhere else but at the feet as you sit in the car because that's where that stain is. His semen and the 14-year-old's DNA." (Emphasis indicating challenged statements.)

Finally, Longoria points to sarcastic statements made by the prosecutor in response to defense counsel's arguments that the State had failed to establish that duct

tape taken from Longoria's home was related to the crime. In response, the prosecutor argued:

"*Then we hear about duct tape too. Why didn't you hear from the State? Why was it collected? It was collected because it was thorough.* It's a thorough investigation because it maybe could have been the duct tape. Could he have thrown the duct tape he used away in that [convenience store's] trash can? Maybe. Maybe he threw it into that little pond or lake or whatever it is. Maybe he threw it in one of the Venture's plants out at the plant. *I don't know, but there's duct tape on that 14-year-old, and it got there somehow. Did he use the tape from his home? Maybe. He may not be that smart, and nobody's saying that he is, but maybe he was smart enough not to use the tape from his own house.*

"*And let's talk about the [convenience store's] video. They give us that, that, yeah, that is him. Thank you very much. We know it's him. You don't have to concede it, and we know it's him buying less than a half a gallon of gasoline. Was he filling up the car? Are you kidding me? Seriously? They're asking you to dump your common sense.*" (Emphasis indicating challenged statements.)

## 6.2 *The Prosecutor Did Not Commit Misconduct*

In analyzing Longoria's argument, we must first determine whether the prosecutor made statements that fall outside the wide latitude allowed in discussing the evidence. Upon finding misconduct, we next assess whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2012); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

A prosecutor has wide latitude in crafting arguments and drawing "reasonable inferences from the evidence but may not comment on facts outside the evidence." *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 7, 307 P.3d 1278 (2013); *State v. Ly*, 277 Kan. 386, 392, Syl. ¶ 4, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004). Any argument "must

accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012) (quoting *Tosh*, 278 Kan. at 90); *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000).

Generally, a prosecutor may use rhetorical devices—"analogies, similes, allusions (be they historic, poetic, literary, or scientific)"—as a tool for putting the facts of a case into a meaningful context. *State v. Hilt*, 299 Kan. 176, 198, 322 P.3d 367 (2014) (quoting *State v. Henderson*, 32 Kan. App. 2d 1202, 1210, 96 P.3d 680 [2004]). The prosecutor must restrict the use of any rhetorical device to "sensible limits set by similarity and dissimilarity to the facts of a case." 299 Kan. at 198. Additionally, a prosecutor must not state or argue his or her personal opinion regarding the guilt or innocence of the defendant or the credibility of any witnesses. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012); Kansas Rules of Professional Conduct 3.4(e) (2014 Kan. Ct. R. Annot. 619).

In this case, Longoria asserts that a prosecutor's use of sarcasm crosses the line of appropriate rhetoric and amounts to misconduct. To support his claim, he relies on *State v. Salamon*, 287 Conn. 509, 564, 569, 949 A.2d 1092 (2008) (holding that the prosecutor's line of questioning of the sole defense witness was sarcastic, repetitive, and intended to convey to the jury the prosecutor's own belief as to the credibility of the witness, while improper not sufficiently harmful to warrant reversal), and *State v. Rizzo*, 266 Conn. 171, 261-64, 273, 833 A.2d 363 (2003) (prosecutor's repeated sarcastic use of "please" in response to defendant's arguments inappropriately "called upon the jurors' feelings of disdain" and required reversal of penalty phase). In arguing that this case falls in line with these cases, Longoria asserts the prosecutor did not properly discuss the facts

44

but rather sarcastically ridiculed the defense by using the term "seriously" and likening defense theories to UFO's and aliens.

In response, the State concedes that it used some sarcasm as a rhetorical device and cites to three cases that support its claim that sarcasm is not altogether prohibited. The State argues these cases bear more similarity to the comments at issue than do the statements in the cases cited by Longoria. Specifically, the State notes that its statements addressed defense counsel's argument and raised proper inferences from the evidence. See *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992) (holding the prosecutor's reference to defense counsel as a "know-it-all" and "Mr. Thorough" were permissible inferences based on evidence and arguments presented and not misconduct); *People v. Banks*, 237 Ill. 2d 154, 182-83, 934 N.E.2d 435 (Ill. 2010) (The prosecutor's rebuttal remarks stating "Bravo. Bravo for Mr. Wonderful over here. Bravo that he didn't fight with [law enforcement]" was in response to defense counsel's closing argument and not improper as the "wide latitude extended to prosecutors during their closing remarks has been held to include some degree of both sarcasm and invective to express their points."); *People v. Overlee*, 236 A.D.2d 133, 142, 666 N.Y.S.2d 572 (1997) (holding the defendant's challenge that the prosecutor used snide remarks to portray him as a liar was not prejudicial because "[t]he use of sarcasm is, of course, a well recognized device to illustrate the inherent implausibility of a witness's testimony").

These two lines of cases suggest that prosecutors may use sarcasm as an occasional rhetorical device. But we caution that it cannot be used in ways that distract the jury from its charge, demean the adversarial trial process, or become unprofessional to the point of jeopardizing a verdict. Sarcasm has the potential to alienate the jury or unfairly influence it into abandoning its role as a factfinder.

Because the line between appropriate and inappropriate use of sarcasm is thin, making it easy to cross, prosecutors should avoid repeated use of the technique in most cases. And its occasional use can be "no more than sarcastic hyperbole identifying what the prosecutor believe[s] to be weakness in the defense explanation of events." *People v. Cummings*, 4 Cal. 4th 1233, 1303 n.48, 850 P.2d 1 (1993). As we have recognized, "prosecutors [have] considerable latitude to address the weaknesses of the defense." *State v. Duong*, 292 Kan. 824, 832, 257 P.3d 309 (2011). Sarcasm, when appropriate, should be thoughtfully tailored to specific arguments and evidence; sarcasm should not set the tone of the prosecutor's entire argument or rebuttal.

In this case, the prosecutor came dangerously close to crossing the line, and he stepped directly on—but not over—the line several times. Significantly, the prosecutor did not rely only on sarcasm to establish weaknesses in the defense. Instead, after using sarcasm to highlight a weakness in the defense's argument, the prosecutor consistently returned to discussions of specific evidence in the case that pointed to circumstances giving rise to a strong inference that Longoria murdered A.D.

Further, the prosecutor did not comment on facts not in evidence in conveying, with some sarcasm, the weaknesses of the defense theories. While the prosecutor's sarcasm came dangerously close to asserting a personal opinion, his effort to tie any statements back to the evidence ameliorated the suggestion that the statements were his personal view. Indeed, the prosecutor repeatedly stressed to the jurors the importance of deciding the case based on the facts and repeatedly reminded the jurors that the attorneys' arguments were not evidence.

We, therefore, conclude the prosecutor remained within the wide latitude allowed in discussing evidence. Because there was no misconduct, we need not discuss the second

step—the prejudice step—of the prosecutorial misconduct analysis. See *Bridges*, 297 Kan. at 1012; *Tosh*, 278 Kan. at 85.

Issue 7: *Did the trial court err in failing to declare a mistrial based on juror misconduct?*

Next, Longoria argues the trial court erred in failing to declare a mistrial after a juror was overheard talking about the case at a restaurant. The State responds that the trial court appropriately conducted an investigation into the allegation, received evidence, weighed the evidence, and did not abuse its discretion in believing the juror when the juror stated that he did not discuss the facts of the case with a third party. Alternatively, the State argues Longoria cannot show that his rights were substantially prejudiced by the alleged juror misconduct so as to constitute a ground for mistrial.

7.1 *Additional Factual and Procedural Background*

Several days into Longoria's jury trial, a Barton County sheriff's officer contacted the trial court regarding information the officer had received from a person not involved in the trial; the individual had reported overhearing bits of conversation between Juror M and an employee of a restaurant where Juror M and the reporting individual had dined. Reportedly, Juror M and the restaurant employee had discussed blood spatter evidence, lesser included offenses, and the length of the trial. The sheriff's officer interviewed the restaurant employee, who indicated she knew Juror M and admitted to having a conversation with him about the trial. She reported that the conversation lasted less than 2 minutes and that she only learned that he was on the jury and that he hoped the trial would not interfere with a planned trip. The employee disclosed that Juror M also had a conversation with a local attorney.

As a result of the report, the trial court inquired of Juror M regarding the conversations. Juror M admitted to going to dinner at the restaurant and acknowledged that the subject of the trial came up in conversations with some acquaintances. He said he tried not to talk at length about anything. A local attorney asked him if he was on the jury, and Juror M replied "yeah, you know," but "[d]idn't let it go any further." The attorney asked if another individual was on the jury panel, but Juror M refused to give an affirmative response. When asked if he talked about the evidence, Juror M responded "absolutely not." When asked again if he talked to anyone about evidence, Juror M responded: "[H]onestly, no. I wouldn't do that." The court asked Juror M if he could still be fair to the defendant and the State of Kansas; Juror M responded that he was confident he would be fair.

At the court's request, the sheriff's officer contacted the attorney and questioned him about his conversation with Juror M. The attorney admitted to talking to Juror M— "It was just an incidental meeting." The attorney said that he assumed Juror M did not get impaneled on the jury, so he asked. When Juror M refused to answer, the attorney realized that Juror M had made it onto the jury, and they left it at that. The attorney told the sheriff's officer that they discussed the court process in general, and Juror M only said that "he hoped that he could make the right decision and that he had an open mind and he was going into this to do his best." The attorney adamantly denied discussing anything inappropriate or observing juror misconduct.

Longoria's defense counsel requested Juror M's removal from the jury. Counsel pointed to the fact that Juror M did not mention speaking to the restaurant employee until he was prompted and that the reporting party indicated Juror M had said more than the simple fact that he was a juror, including matters such as blood spatter and lesser included offenses. In denying the request, the court found Juror M credible and believed that the conversations he had did not extend further than Juror M acknowledging that he

48

was a juror. The trial court further stated: "[A]t this point, there is no indication that . . . there would be substantial prejudice to either party because of this."

Longoria did not move for mistrial. Nor did he use Juror M's conduct as a basis for mistrial at any point before the jury verdict, even though he moved for mistrial for other reasons.

Posttrial, Longoria timely moved for a new trial on various grounds, including the trial court's failure to dismiss Juror M. The trial judge heard and denied the motion at Longoria's sentencing hearing. In discussing the juror misconduct issue, the court incorporated its previous ruling after indicating nothing new had been presented.

7.2 *Preservation*

Longoria couches this issue in the context of a motion for mistrial, and the State responds in kind. But, as noted, Longoria never moved for mistrial based on juror misconduct under the mistrial statute, K.S.A. 22-3423. Rather, he presented the issue to the trial court by (1) asking for Juror M's removal and (2) filing a motion for new trial under K.S.A. 2011 Supp. 22-3501. Thus, he preserved the juror misconduct issue but not through a motion for mistrial.

The State has not suggested that Longoria failed to preserve this issue by arguing an error in failing to grant a motion for mistrial rather than a motion for new trial. Longoria's labeling of his alleged error is more a matter of editing than of substance. He relies on *Bell v. State*, 46 Kan. App. 2d 488, 491, 263 P.3d 840 (2011), *rev. denied* 249 Kan. 1129 (2012), which concerns a motion for a new trial based on juror misconduct.

Further, when assessing juror misconduct based on a motion made during trial or on one filed posttrial, courts essentially apply the same standard to determine whether a new trial should be granted. The motion for mistrial statute, K.S.A. 22-3423(1)(c), permits a trial court to declare a mistrial because of "[p]rejudicial conduct, in or outside the courtroom, [which] makes it impossible to proceed with the trial *without injustice* to either the defendant or the prosecution." (Emphasis added.) Similarly, a new trial can be granted under K.S.A. 2011 Supp. 22-3501(1) "if required in the *interests of justice*." (Emphasis added.) Both of these inquiries essentially ask whether the juror misconduct deprived the parties of a fair trial. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see also *State v. Whitesell*, 270 Kan. 259, 286-87, 13 P.3d 887 (2000) (using terms "new trial" and "mistrial" interchangeably when discussing standard of review). Plus, appellate courts apply an abuse of discretion standard when reviewing either the denial of a motion for mistrial or a motion for new trial. See *State v. Armstrong*, 299 Kan. 405, 442, 324 P.3d 1052 (2014) (standard of review of a trial court's decision on a motion for mistrial is an abuse of discretion); *State v. Holt*, 298 Kan. 469, 473, 313 P.3d 826 (2013) (abuse of discretion standard of review applies to appeals regarding trial court's motion for new trial ruling).

We, therefore, will treat the issue as preserved but address the arguments as presented to the trial court—via a motion for new trial—and will examine whether the trial court abused its discretion in denying Longoria's motion because of Juror M's misconduct.

7.3 *Denying the Motion for New Trial Was Not an Abuse of Discretion*

Allegations of juror misconduct trigger a progressive two-step inquiry to determine if either a mistrial or new trial is warranted: (1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair

50

trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome. As we have noted, an appellate court reviews the trial court's determination of these two issues under an abuse of discretion standard. *Ward*, 292 Kan. at 550, 569-70 (discussing standard in mistrial context); *State v. Mathis*, 281 Kan. 99, Syl. ¶ 2, 130 P.3d 14 (2006) (new trial context).

As to the first step, Longoria contends that Juror M improperly discussed evidence outside the courtroom. Faced with an allegation that a juror held an inappropriate conversation outside of trial, "[i]t is the usual practice to question the juror involved in complaints alleging misconduct." *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621, *cert. denied* 493 U.S. 842 (1989), *overruled on other grounds by State v. Rinck*, 260 Kan. 634, 923 P.2d 67 (1996). After an inquiry has been made, which the trial court did in this case, an appellate court gives a high degree of deference to the trial court's findings concerning the credibility of witnesses and the perceived impact of the allegedly prejudicial event. *Armstrong*, 299 Kan. at 444; *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 (2013) ("An appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence."). We simply review those findings to determine whether substantial, competent evidence supports them. *Ward*, 292 Kan. at 550 (abuse of discretion can occur if trial court bases its decision on unsupported facts); see also *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 (2013) ("Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.").

Here, substantial competent evidence suggests that Juror M discussed the case, at least in general terms. Nevertheless, simply establishing an external communication— that is, a communication between a juror and a third person or a witness—does not invalidate a verdict unless the communication "disturb[s] the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149-50, 13 S. Ct. 50, 53, 36

51

L. Ed. 917 (1892); *Ward*, 292 Kan. at 550, 569 (misconduct must substantially prejudice the right to a fair trial). The trial court determined nothing about Juror M's conversations suggested a basis for finding prejudice to either party. Substantial competent evidence supports this conclusion. Juror M, the attorney, and the restaurant employee stated that their conversations with each other did not concern Longoria's guilt or the evidence presented at trial. According to each of them, they limited their conversations to the fact that Juror M was a juror, the length of the trial, and the court process in general. Statements from the restaurant patron who initially reported overhearing some discussion potentially weighed against the credibility of these statements. But the patron mentioned discussion of blood spatter—and the State's evidence in Longoria's case did not include blood spatter. Thus, the trial court could reasonably conclude that the patron overheard an unrelated conversation and that there had not been a discussion by Juror M regarding blood spatter evidence relating to Longoria's case.

In other words, substantial competent evidence supports the trial court's finding that nothing prejudicial was discussed, and a reasonable person could accept the trial court's conclusion that nothing occurred that would prejudice the right of either party to a fair trial.

Issue 8: *Was there sufficient evidence of an underlying sex crime to support Longoria's convictions of capital murder?*

Longoria asserts insufficient evidence supported his capital murder convictions.

For his three alternative capital murder charges, the State had to prove beyond a reasonable doubt that (1) Longoria intentionally and with premeditation killed A.D. in the commission of, or subsequent to, the crime of attempted rape; or (2) Longoria intentionally and with premeditation killed A.D. in the commission of, or subsequent to, the crime of criminal sodomy; or (3) Longoria intentionally and with premeditation killed

52

A.D. in the commission of, or subsequent to, the crime of aggravated criminal sodomy. See K.S.A. 21-3439(a)(4). The jury returned a guilty verdict on all three alternatives. At the sentencing hearing, the State asked the sentencing court to sentence Longoria for capital murder based on aggravated criminal sodomy, and the court did so.

In this appeal, Longoria does not challenge the sufficiency of the evidence insofar as it supports the elements that Longoria murdered A.D. or, as we noted earlier, that he did so with premeditation. Nor does he focus on the element that distinguished criminal sodomy from aggravated criminal sodomy under the jury instructions in his case—*i.e.*, that an act of sodomy occurred without A.D.'s consent under circumstances when she was overcome by force or fear. Rather, he argues the State failed to present sufficient evidence of either rape or sodomy—aggravated or not.

Because the court sentenced Longoria based on a killing in the commission of, or subsequent to the commission of, aggravated sodomy, we begin our analysis with the question of whether there was sufficient evidence of aggravated sodomy. To provide an answer, we must review all the evidence in the light most favorable to the prosecution and determine whether we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Importantly, an appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Ward*, 292 Kan. at 581.

Longoria correctly observes that the State did not present direct evidence of a killing in the commission of, or subsequent to, aggravated criminal sodomy. Nevertheless, circumstantial evidence supports his conviction, and a conviction for even the gravest offense may be sustained by circumstantial evidence. *Lowrance*, 298 Kan. at 296; *Ward*, 292 Kan. 541, Syl. ¶ 13.

In arguing that the circumstantial evidence established the crime of aggravated sodomy, the State emphasizes the evidence of Longoria's sexual intent. His text messages to A.D. are strong evidence of that intent. He clearly expressed his attraction to A.D., who he called beautiful, hot, and awesome; he repeatedly asked for pictures; he asked to "date" her; and he lured and pursued her for over a month despite her frequent cold shoulder.

As to the nature of any sex act, the State, as it did at trial, argues that the DNA stain found on the floor mat of the Escape creates a logical inference that an act of sodomy occurred. The stain contained a mixture of Longoria's semen and a fluid from A.D.'s body—not DNA from her merely touching the mat. Through questioning and argument, the State presented the theory that Longoria touched or penetrated A.D.'s mouth with his penis and then either he or A.D. deposited a mixture of the semen and saliva on the floor mat; the State stressed its theory that A.D. spit the mixture onto the floor mat. During the State's closing argument, it argued this scenario was the most logical explanation for the mixture found on the floor mat of the Escape. "How else did it get there? Do you really believe that he masturbated and left it there and she sneezed on top of it later?" The prosecutor also pointed out that "the DNA expert said there's a lot of DNA, not a little tiny amount. There's a lot of DNA on that floorboard. It's consistent with the sodomy."

Forensic testing and the resulting expert opinions neither established that this scenario had occurred nor eliminated the scenario as a possibility. Certainly, the testing could not pinpoint when the sample was deposited. But the forensic analyst opined that the stain occurred in close proximity to the discovery of A.D.'s body because it had not degraded much despite the summer heat and its location in an area of the vehicle that would often come into contact with feet. As well, the forensic expert could not establish with any degree of certainty that A.D.'s DNA came from saliva. True, a presumptive

54

saliva test came back negative, but that only meant that forensics could not verify that the bodily fluid from A.D. was saliva. In other words, the scientific evidence supported the State's theory and nothing negated the inference the State asked the jury to draw.

In arguing the insufficiency of this evidence, Longoria asks us to reweigh the evidence on appeal. He points to the expert's testimony that it was possible that the mixture of DNA found its way to the floor mat weeks—perhaps even months—before the sample was preserved. Moreover, he notes that one of A.D.'s friends testified Longoria had told him that Longoria and A.D. had sex in the Escape, which would support the possibility the semen was deposited sometime before the night of A.D.'s murder. He also points to evidence of a trace amount of unknown male DNA found on one of four forensic swabs from A.D.'s mouth, suggesting this proves someone else committed the crime or, at a minimum, proves that he had not committed oral sodomy on A.D. just before her murder because his DNA was not found on any swab.

While these various points could have created a reasonable doubt in the minds of jurors, the points are not compellingly exculpatory. Indeed, there are reasons to discount each point. Regarding the statement about a prior sexual encounter, Longoria made a number of self-serving statements to friends and even strangers in an attempt to create an alibi and provide an innocent explanation for otherwise incriminating evidence; the statement to A.D.'s friend about a prior sexual encounter could be just one more example. And nothing in the text messages between Longoria and A.D. suggests there had been any sexual contact between them. Also, as to the timing of the semen stain, the expert testified that degradation would be expected because of heat in the Escape and shoes contacting the stain; he testified "[t]he further back you go there's less of a chance." Regarding the small amount of unknown DNA on the swabs, the expert testified his first assumption was contamination and that it might be attributed to something like A.D. sharing a straw.

The jury was free to determine how much credit to give to the conflicting evidence. See *State v. Kettler*, 299 Kan. 448, 470-72, 325 P.3d 1075 (2014). The evidence on these points, taken in the light most favorable to the State, made it reasonable for a juror to reject Longoria's arguments and accept the State's theory as the most logical explanation for the DNA stain. Likewise, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Longoria committed the crime of sodomy or aggravated sodomy on the night of A.D.'s murder. And, as we have noted, our role is not to reweigh the evidence.

The parties also discuss the sufficiency of the evidence supporting the jury's alternative verdict that Longoria intentionally and with premeditation killed A.D. in the commission of, or subsequent to, the crime of attempted rape. In doing so, they do not explore whether such an analysis is necessary—or even appropriate—in light of the State's election to have Longoria sentenced for a premeditated killing committed in the commission of, or subsequent to, the crime of aggravated sodomy. We, therefore, will not delve into the necessity or appropriateness of a discussion of the sufficiency the evidence supporting a verdict based on attempted rape. Instead, we will briefly summarize the evidence that, when viewed in the light most favorable to the State, is sufficient to support the jury's verdict on the alternative ground of attempted rape.

In asserting the insufficiency of the evidence, Longoria notes that A.D.'s body was found fully clothed. And while he concedes that A.D.'s shorts were unbuttoned, he argues no other evidence suggests he took any action toward the completion of the crime of rape. In response, the State emphasizes the presence of duct tape residue on A.D.'s mouth and legs that provides evidence of force and, thus, of an overt act toward the commission of rape. Further, the sexual overtone of Longoria's text messages suggests he acted with a sexual intent when he drove A.D. to a remote location and bound her mouth, nose, and

56

legs. This suggestion is reinforced by the desecration of A.D.'s genital and anal area. Although all of A.D.'s body was badly burned, her genital and anal area and the organs therein were completely burned away. This desecration also suggests Longoria intended to destroy evidence by assuring that vaginal and anal swabs for biological evidence could not be obtained. The destruction and concealment of evidence leads to an inference of a plan or premeditation. See *State v. Scott*, 271 Kan. 103, 110, 21 P.3d 516 (2001). In combination, this evidence is sufficient to convince us that a rational factfinder could have found Longoria guilty of the crime of attempted rape.

Consequently, we affirm Longoria's capital murder convictions.

Affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

* * *

JOHNSON, J., concurring: The majority appears to have reached the correct result under our current caselaw precedent, and I will concur in that result. But I feel compelled to write separately on two matters. First, I cannot traverse the "route to harmlessness" constructed by the majority from the prior "skip rule," which it uses as an alternative rationale for not reversing on the district court's failure to give the lesser included offense instruction on unintentional but reckless second-degree murder. Second, I cannot grasp

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 108,333 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.

the logic in declaring that the identity of the person depicted in a posed, predeath photograph is relevant to the identity of a murder victim whose slain body was set afire.

The majority does acknowledge our recent rejection of the "skip rule" as a mechanically applied, bright-line rule. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 5, 283 P.3d 202 (2012) ("skip rule should be viewed as simply providing a route to harmlessness"); *State v. Simmons*, 295 Kan. 171, Syl. ¶ 5, 283 P.3d 212 (2012) (skip rule "not amenable to mechanical application; rather, it should be viewed as simply providing a route to harmlessness"); *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014) ("We note that the skip rule is not amenable to mechanical application and that it should be viewed as simply providing a route to finding harmless error in those cases in which the elements of the crime of conviction, as compared to a rejected lesser included offense, necessarily show that the jury would have rejected or eliminated a still lesser included offense.").

Likewise, the majority cites to *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 (2012), where we set forth the steps to follow in analyzing a failure to instruct issue raised for the first time on appeal. At the last step—reversibility—we burdened the appellant with a clearly erroneous standard requiring the appellant to firmly convince the appellate court that the jury would have reached a different result if the unrequested instruction had been given. In my view, the crime with which the jury convicted the defendant in relation to the lesser included offenses it rejected to reach that verdict would simply be part of the clearly erroneous reversibility calculus. In other words, if the jury's rejection of a lesser included offense would logically indicate a rejection of a still lesser included offense, the appellant would be hard-pressed to carry the burden of firmly convincing the appellate court that the jury's verdict would have been different with the still lesser included offense instruction. I see no reason for a separate "skip rule"

harmlessness analysis, and, to avoid any possible confusion among the bench and bar, I would abandon all future mention of that particular term.

Here, simply utilizing the clearly erroneous reversibility standard and reviewing the evidence presented to the jury, I concur in the result because I am not firmly convinced that the jury would have reached a different verdict if it had been given the unintentional but reckless second-degree murder instruction. Nevertheless, in my view, the jury's rejection of intentional second-degree murder in favor of the crime of conviction for a version of premeditated first-degree murder has no logical part to play in that reversibility determination. The fact that the jury selected one version of intentional killing over another version of intentional killing does not logically eliminate a reckless version of homicide, *i.e.*, does not provide a route to harmlessness. The majority's emphasis on the jury's having found premeditation and intent to kill in the crime of conviction, while rejecting just an intent to kill in the given lesser included offense of second-degree murder, tells us nothing about the jury's view on recklessness. The principal crime almost always has an element that is missing in a lesser offense, so that the majority's rationale would almost always render harmless the failure to instruct on lesser included offenses. To the contrary, the point here should be that the jury was not given an opportunity to choose a reckless killing over an intentional one so that there would be nothing for the jury to "skip."

In my view, an example where the "skip rule" logic would come into play would be where a jury convicted the defendant of intentional second-degree murder, while rejecting a lesser included offense instruction on unintentional but reckless second-degree murder, and the defendant complains on appeal that the district court should have given an unrequested reckless involuntary manslaughter instruction. The jury had a choice between an intentional killing and an unintentional but reckless killing and chose intentional. The jury's rejection of one severity level of recklessness logically eliminated

a yet lesser version of reckless homicide. Accordingly, the failure to instruct on reckless involuntary manslaughter would not have been clearly erroneous because a conviction on that crime would have been logically inconsistent with the jury's rejection of reckless second-degree murder. We simply do not have such foreclosure in this case.

Turning to the issue of the predeath photograph of A.D., I have to acknowledge that the majority's holding—that a photograph of a victim taken before the killing is relevant because the State has to prove the identity of the victim—is but a continuation of such pronouncements from prior Kansas cases. But I must also acknowledge that I am unable to understand the logic of such a declaration.

"Relevance is the threshold issue any time evidence is evaluated for admission into the record." *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014). Statutorily, relevance is defined as evidence which has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). But we have gone further, dividing relevance into two components, materiality and probativity, and explaining that evidence is material when the fact it supports is in dispute or is an issue in the case, and that evidence is "probative when it has a logical tendency to prove a material fact. *State v. Prine*, 297 Kan. 460, 477, 303 P.3d 662 (2013); *State v. Reid*, 286 Kan. 494, 504-06, 186 P.3d 713 (2008); *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 (2007)." *Huddleston*, 298 Kan. at 959.

I fail to see how a photograph depicting what a person looked like prior to the murder has any tendency in reason to prove the identity of the slain person. If the identity of the human being found slain and burned at the asphalt plant was a material fact that the State was required to prove, a predeath photograph of A.D. would not make it more probable than not that the burned corpse was A.D. If the defense had called 20 mothers to the stand to testify that the school picture they were handed depicted the image of their

60

respective daughter, would that have been relevant to the identity of the murder victim? Of course not. The only reason that A.D.'s mother's identification of the predeath photograph meant anything to the jury was that A.D. had already been identified as the human being found slain and burned at the asphalt plant.

And the fact that A.D. was, in fact, the victim was uncontested, so it is inscrutable to me that the majority would view a predeath picture as material to the undisputed fact of victim identity. Moreover, if the State wanted to prove the victim's identity with evidence, in lieu of the defense stipulation on that fact, then it had to prove the identity of the *slain* body. The State had no legitimate reason for showing the jury what the victim looked like *before* the murder; the only discernable purpose for such a photograph would be to play to the jury's sympathy.

In short, I would not condone the State's ploy, albeit I would find the error to be harmless here.