NOT DESIGNATED FOR PUBLICATION

No. 111,159

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DOUGLAS PETERMAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Hodgeman District Court; BRUCE T. GATTERMAN, judge. Opinion filed December 11, 2015. Affirmed in part and vacated in part.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant, and *Douglas D. Peterman*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, of Office of Kansas Attorney General, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Judge, assigned.

*Per Curiam*: Douglas Peterman appeals his convictions and sentences for three counts of aggravated indecent liberties with a child. Among other things, Peterman argues on appeal that (1) the district court improperly limited cross-examination by excluding relevant evidence under the rape shield statute; (2) the district court erred in admitting K.S.A. 2011 Supp. 60-455 evidence; (3) the prosecutor committed misconduct; (4) the district judge committed misconduct; and (5) the district court erred in imposing lifetime electronic monitoring. The State stipulates that the district court was not authorized to impose lifetime electronic monitoring upon a defendant convicted of an off-

grid sex crime when Peterman committed his crimes. We do not, however, find any of Peterman's other arguments to be persuasive. Thus, we affirm in part and vacate in part.

## FACTS

F.W. and her sisters were removed by the State from her family home in April 2012. She was placed in foster care and began therapy with Sylvia DesLauriers the following month. While speaking with DesLauriers, F.W. described a nightmare she was having about Peterman. F.W. explained that Peterman was an adult family friend and alleged that he had sexually abused her. Each time F.W. met with DesLauriers, she provided additional information about the incidents of sexual abuse.

The first alleged incident of abuse occurred in October 2010, when F.W. was 10 years old. F.W. was alone with Peterman at his house, and after Peterman checked the other bedrooms [to ensure that they were alone], he asked F.W. to come into his bedroom. F.W. complied and sat on Peterman's bed. According to F.W., Peterman sat down next to her and put his arm around her. He then proceeded to kiss F.W. on her lips, on her face, and on her ear. In addition, Peterman rubbed his hands on F.W.'s arm while kissing her.

About 1 month after the kissing incident, F.W and Peterman were lying together on his bed. F.W. alleged that Peterman kissed her ears, cheeks, and lips while rubbing her arms. Peterman then started licking F.W.'s pants on the area of her vagina. Following the incident, F.W. noticed her pants were wet where the licking took place.

The third incidence took place a few days before F.W. went into foster care in 2012. F.W. and Peterman were in his bedroom again. Peterman told F.W. that he loved her and then started kissing her cheeks and ears. Peterman again licked F.W.'s pants on the area of her vagina so that her pants became wet.

2

Ultimately, the State charged Peterman with three counts of aggravated indecent liberties with a child and the case proceeded to jury trial in October 2013. In addition to testimony regarding the three alleged incidents, the State also elicited testimony about the relationship between F.W. and Peterman. Specifically, F.W. testified that Peterman repeatedly told her when he gave her gifts that she was his girlfriend and would ask her to marry him.

F.W.'s sister, M.W., testified that she often observed Peterman doing this and that she found it strange. Both F.W and M.W. testified that even though Peterman also bought gifts for F.W.'s sisters, he never talked about marrying them. Moreover, the gifts he bought F.W. were sometimes bigger or more expensive than those he gave to her sisters.

DesLauriers testified about conduct that is considered to be "grooming" by sexual perpetrators to gain the trust of a victim and a victim's family. She testified that sexual perpetrators might try to groom a child by spending time with them, buying them "special gifts," or doing fun things with them.

In addition, F.W testified that while driving with Peterman he sometimes asked her if she wanted to rest her head on his lap. On one occasion, M.W. took several videos of F.W. with her head on Peterman's lap while he drove. The videos were admitted into evidence over Peterman's objection.

Patricia Copeland—a patron who sat directly behind Peterman and F.W. during a production of "My Fair Lady" in Dodge City—witnessed Peterman's interaction with F.W. and found it disturbing. Copeland observed that Peterman sat next to F.W., kept his arm around her for "hours," and both whispered into and kissed F.W.'s ear numerous times. Copeland testified that Peterman and F.W. gave the appearance of being boyfriend and girlfriend. In fact, she thought that their interaction to be so disturbing that she took pictures and turned them into the police.

Peterman testified in his own defense at trial. Although he admitted treating F.W. "somewhat" differently than her sisters, Peterman claimed this was because she had emotional issues and needed more attention. He also admitted to calling F.W. his girlfriend but asserted he used the term as slang. In addition, Peterman admitted to teasing F.W. about marrying him as part of a running joke to prevent her from marrying her boyfriend. Peterman described his relationship with F.W. as a helpful family friend and told the jury that the alleged incidents of sexual abuse never happened. He also denied kissing F.W. on the ear during the play in Dodge City.

Following deliberations, the jury found Peterman guilty on all counts. On November 7, 2013, the district court sentenced him under Jessica's Law—see K.S.A. 2011 Supp. 21-6627(a)(1)(C)—to concurrent mandatory hard-25 life sentences. Thereafter, Peterman timely appealed.

ANALYSIS

*Exclusion of Evidence under Rape Shield Statute*

Peterman contends the district court erred in denying his request to admit evidence of alleged sexual conduct between F.W. and a boyfriend, P.R., under the Kansas rape shield statute. See K.S.A. 2011 Supp. 21-5502 (formerly K.S.A. 21-3525). Specifically, he argues that he should have been able to introduce evidence of the alleged sexual relationship because it was relevant to explain F.W.'s motive in making the accusations against him. In particular, Peterman asserts that F.W. was mad at him for attempting to stop her from having sex because she was too young. We review a district court's decision to exclude evidence under the rape shield statute for an abuse of discretion. See *State v. Holman*, 295 Kan. 116, 140, 284 P.3d 251 (2012). A district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable, (2) based on an

4

error of law, or (3) founded on an error of fact. *State v. Waller*, 299 Kan. 707, 722, 328 P.3d 1111 (2014).

Prior to trial, Peterman filed a "MOTION FOR INTRODUCTION OF PRIOR SEXUAL CONDUCT BY VICTIM" under K.S.A. 2012 Supp. 21-5502. The motion stated, in part, that Kansas Department of Children and Families records reviewed by both counsels "indicate that [F.W.] was involved in a sexual relationship with P.R. at the time of the allegations against [Peterman]." The motion contended that Peterman's attempt to end the sexual relationship between F.W. and P.R. prompted F.W. to lodge the current allegations. The motion also stated that the district court "must rule upon the proffered evidence of prior sexual conduct by the complaining witness only after the defendant files a written motion seeking the admission."

The State maintains that Peterman's motion failed to comply with the offer of proof requirements of the rape shield statute that a movant must follow to overcome the general exclusion of any purported evidence of prior sexual conduct.

The rape shield statute generally prevents the admission of "evidence of the complaining witness' previous sexual conduct with any person including the defendant." K.S.A. 2011 Supp. 21-5502(b). The statute expressly requires that defendants

> "make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. The motion shall be made at least seven days before the commencement of the proceeding unless that requirement is waived by the court. The motion shall state the nature of such evidence or testimony and its relevancy and shall be accompanied by an affidavit in which an offer of proof of the previous sexual conduct of the complaining witness is stated." K.S.A. 2011 Supp. 21-5502(b).

5

In ruling that the rape shield statute prohibited any evidence relating to the alleged sexual relationship between F.W. and P.R., the district court based its decision in part on its finding that "[t]he court has nothing before it to confirm whether or not any sexual activity occurred between [P.R.] and [F.W.]." This finding is consistent with the clear obligation set forth in K.S.A. 2011 Supp. 21-5502(b) that a defendant's motion "*shall be accompanied by an affidavit* in which an offer of proof of the previous sexual conduct of the complaining witness is stated." (Emphasis added.)

Here, Peterman admits that he did not submit the required affidavit to the district court—and he has not provided one on appeal. Granted, a panel of this court has recognized a limited circumstance in which the procedural requirements of the rape shield statute must yield to a defendant's constitutional right to confront witnesses. See *State v. Barber*, 13 Kan. App. 2d 224, 226, 766 P.2d 1288, *rev. denied* 244 Kan. 739 (1989). However, without an affidavit from Peterman specifically proffering evidence of the alleged sexual conduct between F.W. and P.R., the district court could not properly weigh its possible relevance and admissibility.

We find Peterman's failure to comply with the statutory procedure in the rape shield statute to preclude the admission of the purported evidence he desired to introduce at trial. See *State v. Walker*, 252 Kan. 117, 134-35, 843 P.2d 203 (1992) (absent waiver, defendant's failure to comply with notice provision of rape shield statute precluded admission of evidence of rape victim's past sexual activity); *State v. Smith*, 39 Kan. App. 2d 204, 214-15, 178 P.3d 672 (failure to comply with statute precludes the admission of the evidence), *rev. denied* 286 Kan. 1185 (2008). Because Peterman failed to comply with the procedural requirements of the K.S.A. 2011 Supp. 21-5502, we need not address the merits of his argument.

6

*Admission of K.S.A. 2011 Supp. 60-455 Evidence*

Peterman next contends that the district court erred in determining K.S.A. 2011 Supp. 60-455 did not apply to the evidence that F.W. had put her head in his lap while driving. He argues the act could have been charged as a crime and was not relevant to prove propensity or to support his behavior was grooming. On the other hand, the State argues that the evidence in question was not a crime subject to the prohibitions found in K.S.A. 2011 Supp. 60-455; that the evidence was relevant to establish the type of relationship Peterman and F.W. shared; and—as such—was circumstantial evidence of Peterman's intent.

When reviewing a district court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless statutorily prohibited. K.S.A. 60-407(f); *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." This definition encompasses two elements:  a materiality element and a probative element. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009). Standards of review for each element vary.

A fact is material if it "has a legitimate and effective bearing on the decision of the case and is in dispute." *State v. Stafford*, 296 Kan. 25, 43, 290 P.3d 562 (2012). Review for materiality is de novo. *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 (2013). Evidence is probative if it has any tendency to prove the material fact. *Stafford*, 296 Kan. at 43. An appellate court reviews the district court's assessment of the evidence's probative value under an abuse of discretion standard. *Ultreras*, 296 Kan. at 857. However, even if evidence is relevant, a district court has the discretion to exclude the evidence where the court finds that the potential for producing undue prejudice outweighs its probative value. See K.S.A. 60-445. An appellate court reviews any such

determination for an abuse of discretion. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013).

A court's consideration of the admissibility of evidence can also require application of statutory rules controlling the admission and exclusion of certain types of evidence. These statutory rules are applied as a matter of law or as an exercise of the district court's discretion, depending on the applicable rule. See *State v. Holman*, 295 Kan. 116, Syl. ¶ 6, 284 P.3d 251 (2012). The standard of appellate review varies accordingly.

Here, the applicable statutory rule, K.S.A. 2011 Supp. 60-455 provides that evidence that a person committed a crime or a civil wrong on a specified occasion is inadmissible to prove the person's disposition to commit crime as the basis for the inference that the person committed another crime or civil wrong on another specified occasion. However, this evidence is admissible only if it is relevant to prove a material fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. K.S.A. 2011 Supp. 60-455(b). Whether the district court properly admitted evidence pursuant to K.S.A. 2011 Supp. 60-455 is a matter of law that this court reviews de novo. *State v. Horton*, 283 Kan. 44, 51, 151 P.3d 9 (2007).

At a pretrial hearing, the district court addressed the State's motion that sought, in part, permission to produce a video recording by M.W. and supporting testimony that on one occasion F.W. was lying down with her head on Peterman's leg as he was driving. The State argued this evidence did not fall under K.S.A. 2011 Supp. 60-455 and was relevant to show that Peterman treated F.W. as his girlfriend. Peterman argued that even though the evidence with F.W. lying with her head in his lap showed "no activity. No torrid activity alleged," the evidence should have been excluded because the State was trying to prove propensity without having to use K.S.A. 2011 Supp. 60-455. The district court ruled that the evidence was not subject to K.S.A. 2011 Supp. 60-455 and went to a

8

question of fact relevant to show Peterman's intent. The district court found that because the alleged relationship between Peterman and F.W was "subject to more than one explanation," its probative value outweighed its prejudicial value.

Before reaching the threshold question of relevance, we first ascertain whether the district court was obligated to apply the statutory rules controlling the admission and exclusion of evidence under K.S.A. 2011 Supp. 60-455 or if it was limited to the ordinary rules of evidence. Peterman contends that the jury could have considered evidence of F.W. placing her head in his lap met the definition of lewd fondling or touching, which was stated in *State v. Ta*, 296 Kan. 230, Syl. ¶ 5, 290 P.3d 652 (2012). Specifically, Peterman claims that "[d]ue to the proximity to [his] genitals and the intimate nature of the gesture, such an action could be considered licentious."

For support, Peterman cites to *State v. Rowray*, 18 Kan. App. 2d 772, 860 P.2d 40, *rev. denied* 254 Kan. 1009 (1993). In *Rowray*, this court held that a victim's testimony that defendant "forcefully pulled down her underwear" on one occasion and that defendant "repeatedly grabbed and squeezed her upper thigh" on another occasion was sufficient evidence of lewd fondling to support defendant's multiple convictions for indecent liberties with a child. 18 Kan. App. 2d at 779. Peterman equates the act of allowing F.W. to place her head on his lap with the actions of the defendant in Rowray having repeatedly grabbed and squeezed the upper thigh of a child.

In *Ta*, the defendant argued at trial there was insufficient evidence that he had committed a lewd touching to support his convictions of aggravated indecent liberties with a child. The State presented evidence that the police had contacted the defendant after receiving complaints that he had touched the faces, hair, arms, and legs of two young girls. The defendant told the police "'he wanted to have sex with children'" and was having trouble controlling his urges. 296 Kan. at 233. On appeal, the Kansas

9

Supreme Court held that the defendant's actions—touching the children's faces, hair, arms, and legs—were not lewd actions when considered independent of his intent.

Our Supreme Court summarized its holding as follows:

"If a defendant is charged with aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A) [see K.S.A. 2011 Supp. 21-5506(b)(3)(A)], which requires the State to prove that the defendant committed a lewd fondling or touching with the intent to arouse or satisfy sexual desires, the defendant's mental state should not be used to define or determine whether the touching or fondling is lewd. Rather, whether a touching or fondling is lewd should be determined by considering the common meaning of the term 'lewd,' that is, whether a touching is sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; or indecent, obscene, or salacious. In considering if a touching meets this definition, a factfinder should consider whether the touching tends to undermine the morals of a child and is so clearly offensive as to outrage the moral senses of a reasonable person." 296 Kan. 230, Syl. ¶ 5.

Applying the common meaning of the term "lewd" to the facts here, *Ta* did not require the district court to consider the evidence that F.W. had put her head in Peterman's lap while driving fit the definition of "lewd touching" and was a prior crime under K.S.A. 2011 Supp. 60-455. Not taking into account Ta's statements regarding his subjective intent, our Supreme Court determined that the defendant's touching in *Ta* could be interpreted as innocent. 296 Kan. at 242-43. Peterman makes a similar argument in the present case.

In questioning F.W. about having her head on his lap while driving, Peterman had F.W. clarify that her head was on his "upper thigh." Peterman then asked F.W. if anything "inappropriate" or "sexual happened when you had your head there," and F.W. responded, "No." During the cross-examination of F.W.'s sister, M.W., who was in the vehicle and took the video of F.W. with her head in Peterman's lap, Peterman asked

10

M.W. if what she observed seemed "pretty innocent, normal." M.W. responded, "Yes." Moreover, in making this argument, Peterman did not include in the record the video evidence taken by M.W. and does not cite to any portion of the record that would support his claim regarding the licentious nature of the evidence. He, therefore, has failed in his duty to designate a record sufficient to establish the claimed error. See *State v. Goodson*, 281 Kan. 913, 919, 135 P.3d 1116 (2006).

Having concluded that there is no basis for the district court to view the evidence as K.S.A. 2011 Supp. 60-455 evidence, we turn to the question of relevance. In regards to the evidence's materiality, the relationship between Peterman and F.W. was clearly an issue at trial since both parties devoted testimony and argument to whether Peterman treated F.W. as his girlfriend. The State properly introduced the evidence that F.W. had her head in Peterman's lap while driving for the specific purposes of proving a material fact in dispute and establishing intent.

The jury instruction regarding the evidence of the photographs at the Dodge City play and the video recording of F.W.'s head in Peterman's lap while driving, to which Peterman agreed, supports this conclusion. Instruction No. 11 stated: "This evidence may be considered solely for the purpose of proving the relationship, if any, shared by Mr. Peterman and [F.W.], and [Peterman's] intent." Moreover, the evidence was probative because the conduct depicted in the video had some tendency to prove F.W. and Peterman's relationship as boyfriend and girlfriend.

To be sure, evidence not falling under K.S.A. 2011 Supp. 60-455 that established the day-to-day nature of a sexual perpetrator's relationship with his or her victim aside from any alleged sexual abuse was certainly relevant to establish circumstantial evidence of a perpetrator's intent. Accordingly, we conclude that the district court did not err in admitting the evidence.

11

*Prosecutorial Misconduct*

Through his attorney and his pro se brief, Peterman raises numerous claims of prosecutorial misconduct. Specifically, Peterman's attorney takes issue with the prosecutor urging the jury to consider the lack of evidence presented of F.W.'s motive to fabricate the allegations in this case. Peterman, himself, adds to his attorney's argument by claiming that the prosecutor committed misconduct on 12 occasions during opening and closing statements as well as during witness questioning.

However, the three allegations of misconduct in Peterman's pro se brief directed at the prosecutor's questions during the evidentiary portion of the trial are not properly before this court because Peterman did not lodge a contemporaneous objection. See K.S.A. 60-404. We review a claim of prosecutorial misconduct based on comments made during voir dire, opening statements, or closing argument that are not evidence even when the defendant did not raise a contemporaneous objection during trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200, *cert. denied* 133 S. Ct. 529 (2012). However, a complaining party must make a contemporaneous objection to all evidentiary claims—including questions posed by a prosecutor and responses to those questions—to preserve the issue for appellate review. *State v. Raskie*, 293 Kan. 906, 914, 269 P.3d 1268 (2012). We first review the prosecutorial misconduct claim raised by Peterman's attorney before turning to his 11 remaining pro se issues.

Our review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, we must determine whether the prosecutor's comments were outside the wide latitude that prosecutors are allowed in discussing the evidence. Second, if we find misconduct, we then determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012).

12

In the second step of the two-step analysis, the appellate court considers three factors: "(1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." *Raskie*, 293 Kan. at 914. None of these three factors is individually controlling. Before the third factor can override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 2011 Supp. 60-261(refusal to grant new trial is inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. Inkelaar*, 293 Kan. 414, 427, 264 P.3d 81 (2011).

Under the constitutional harmless error test, the party benefitting from any prosecutorial misconduct must prove beyond a reasonable doubt that the error will not or did not affect the outcome of the trial in light of the entire record. Under the statutory harmless error standard, the court must determine "'if there is a reasonable probability the misconduct affected the outcome of the trial.' [Citations omitted.]" *State v. McCullough*, 293 Kan. 990, 984, 270 P.3d 1142 (2012).

Finally, "'[w]hen a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of alleged errors is analyzed in the context of the trial record as a whole.' [Citations omitted.]" *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010).

*Allegations of Prosecutorial Misconduct Raised by Peterman's Appellate Counsel*

Through appellate counsel, Peterman complains about the following two comments the prosecutor made during closing argument:

13

1) "And what motive—if you want to talk about motive—what motive does this twelve year old, now thirteen years old—ten during the first two events, eleven during the second—or the last event. What motive does she have to make any of this up? You have heard absolutely no evidence that she had any motive to make it up. None. Zero. Zip. Nada."

2) "The Defendant—he had an opportunity—he testified. He had an opportunity to tell you that she had motive to make this up. No. No motive whatsoever."

Peterman claims that the State should not be permitted to argue that there was no evidence of motive presented to the jury when it had successfully moved the district court to exclude evidence of prior sexual conduct of F.W. under the rape shield statute. Peterman opines: "The State cannot be allowed to successfully move the Court to exclude evidence at a pretrial hearing by claiming the evidence is irrelevant and then argue to the jury at trial it should convict because of a lack of the very evidence it previously argued was irrelevant."

As previously discussed, Peterman's failure to comply with the statutory procedure in the rape shield statute precluded the admission of any such purported evidence of a sexual relationship between F.W. and P.R. And contrary to Peterman's assertion, the State did not prevent him from presenting evidence of F.W.'s motive for making these allegations. The State's argument at the pretrial hearing illustrates why Peterman did not need evidence of an alleged sexual relationship between F.W. and P.R., to admit evidence about any motive F.W. may have had to make up the allegations. The State argued, "The [S]tate is not attempting to block [Peterman] from raising the issue that [P.R.] and [F.W.] were in a romantic relationship and [Peterman] wanted to break that up so therefore [F.W.] might make these allegations." The State further pointed out:

"The defense can simply be made by didn't you—weren't you boyfriend/girlfriend? Which she has said they were boyfriend/girlfriend. [Peterman] can say I didn't like the

14

fact that these two were dating. I didn't think they were old enough. And I attempt[ed] to break them up. And she made these allegations against him."

The prosecutor's broad comments regarding motive, or lack thereof, did not specifically reference the lack of any purported evidence of a sexual relationship between F.W. and P.R. to support a motive. And when placed in context, the prosecutor's comments properly noted the lack of any evidence establishing that F.W. had a motive to fabricate the molestation allegations. The aforementioned comments were made immediately before and after the prosecutor's comment, "If someone was going to make something like this up, would it sound like I was there with my clothes on and he licked my vagina until my pants were wet? Does that sound reasonable to you? That someone would make that up with no motive?" The State has considerable latitude to comment on the weakness of the defense. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014). We do not find the prosecutor's comments to have been outside the wide latitude allowed in discussing evidence.

*Allegations of Prosecutorial Misconduct Raised in Pro Se Supplemental Brief*

We first consider whether a comment by the prosecutor made during his opening statement, "Up until this afternoon . . . you have not heard any facts about this case. That ends now," was error as it could "confuse the jury." Peterman argues that this statement confused the jurors by causing them to believe that they were now hearing the truth.

In *State v. Kleypas*, 272 Kan. 894, Syl. ¶ 23, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *overruled on other ground by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), the Kansas Supreme Court held,

> "Opening statements by counsel in criminal prosecutions are not evidence. They are given for the purposes of assisting the jury in understanding what each side expects

15

its evidence at trial will establish and to advise the jury what questions will be presented for its decision. Prosecuting and defense attorneys are permitted reasonable latitude in stating to the jury the facts they propose to prove."

We find that this comment was an opening transition to explain the evidence the State intended to prove and did not exceed the permissible latitude afforded to prosecutors in opening statements.

Peterman next complains of four comments by the prosecutor during closing argument, in which Peterman argues that the State improperly tried to shift the burden of proof to the defendant by referencing the lack of evidence of the victim's ulterior motives. It is improper for the State to attempt to shift the burden of proof to the defendant. *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012). However, the Kansas Supreme Court in *Williams* pointed out that it has repeatedly held the State "does not shift the burden of proof by pointing out a lack of evidence to support a defense." 299 Kan. at 940. As such, we find that the prosecutor did not improperly shift the burden of proof with these comments.

Next, Peterman argues that the prosecutor's comment that "[Peterman] even indicated to you he identified that [F.W.] was the one who needed the most or had the most emotional needs, was the neediest, wanted attention the most" mischaracterized the evidence. A prosecutor must not argue facts not in evidence. However, a prosecutor is given wide latitude to make fair comments on the evidence if the comments are confined to the evidence and reasonable inferences drawn therefrom. *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011).

During his direct examination, Peterman agreed that it was fair to say F.W. "needed more attention because she wasn't getting it elsewhere." Peterman also testified that he had a "father/daughter type" relationship with F.W. and her sisters that was more

16

pronounced with F.W. because F.W. "was a little more needy in that respect." During cross-examination, Peterman agreed with the prosecutor that he had "recognized early on that [F.W.] needed a lot of attention." Peterman also testified that he had found out early on that F.W. "had emotional issues." Because the challenged statement was a fair comment on the evidence, there was no misconduct in the prosecutor's statement.

Last, Peterman complains that the prosecutor argued facts that were not in evidence with the following comment:

> "[F.W.] testified to you–I believe defense counsel says, are you mad about what he did? She goes, yeah, I'm mad about what he did. And of course she was mad after his behavior resulted in them getting removed from the house."

The State concedes that this statement was arguably not directly supported by admitted evidence. Indeed, the evidence presented at trial established that F.W. and her sibling were removed from their home due to a lack parental care and control, so the statement argued facts not in evidence. When a prosecutor argues facts that are not in evidence, appellate courts have consistently found that the first step of the prosecutorial misconduct test is met. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). Thus, we must proceed to step two of the analysis.

The dispositive question is whether the prosecutor's comment amounts to plain error, *i.e.*, whether the comment prejudiced the jury against the defendant and denied the defendant a fair trial. See *Burnett*, 293 Kan. at 850. In the context of the whole trial transcript, we believe that the first two factors—whether the misconduct was gross and flagrant and whether the misconduct showed ill will on the prosecutor's part—weigh in favor of the State. There is nothing in the transcript to indicate that the prosecutor deliberately and repeatedly sought to exceed the bounds of propriety. Application of the third factor—whether the evidence was of such a direct and overwhelming nature that the

17

misconduct would likely have had little weight in the minds of jurors—is similarly straightforward. As mentioned, this inquiry may not override the first two factors unless the harmless error tests of both K.S.A. 2011 Supp. 60-261 and *Chapman* have been met.

Any suggestion that this misconduct on the part of the State affected the outcome of the trial is negated by the fact that Peterman himself made a similar statement to the jury during his closing argument. While discussing F.W.'s motive, Peterman's trial counsel stated, "Look at her situation in mid-2012. [F.W.'s] removed from her home in April. Through [*sic*] many reasons for that. One of them is of course her alleged contact with Doug Peterman." (Emphasis added.) In other words—while not invited error— Peterman complains of statements that he also made to the jury. Moreover, the prosecutor immediately followed up on his improper comment by clarifying "it was [Peterman's] behavior that caused [F.W.] to be angry. Not some other thing that would cause her to make it up."

F.W. clearly testified that Peterman sexually abused her on three occasions. Thus, we cannot conclude that granting a new trial is consistent with substantial justice. See *Huerta-Alvarez*, 291 Kan. at 263-64. Moreover, while the prosecutor's comment was inappropriate, the outcome of the trial primarily rested on the jury's credibility determination based on contradictory testimony, so it is unlikely in the context of a trial as a whole that this single comment directed the jury's verdict.

Further, Peterman complains of six comments by the prosecutor during rebuttal. First, Peterman argues that the prosecutor confused the jury about the burden of proof in the following two comments:

> (1) "Alternative hypothesis, possibly aliens came down and did this. It's possible. I can't prove there's not aliens. I can't prove they didn't come down and lick the vagina through clothing of a ten year old girl."

18

(2) "Is it reasonable to believe that aliens came down and did it? Of course not. Just as it is not reasonable to believe the Defendant's version of events."

The prosecutor's reference to "alternative hypothesis" was in rebuttal to defense counsel's closing argument that the jury could organize the evidence to support a "reasonable alternative hypothesis" to the allegations. Specifically, the prosecutor was responding to defense counsel's example of a reasonable alternative hypothesis which had centered on his wife's lost car keys and his 3-year-old daughter.

The Kansas Supreme Court in *Williams* clarified that a "'prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court.' [Citation omitted.]" 299 Kan. at 938. In other words, the fact that a prosecutor's response was made under the stress of rebutting defense counsel's arguments, we still must still consider if the prosecutor's comments were misconduct. See 299 Kan. at 938.

Citing *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015), the State argues its reference to aliens was a permissible analogy for putting the believability of Peterman's defense in context. Granted, a prosecutor may use rhetorical devices, including analogies, as one tool to put the facts of a case into a meaningful context. 301 Kan. at 524. However, "[t]he prosecutor must restrict the use of any rhetorical device to 'sensible limits set by similarity and dissimilarity to the facts of a case.' [Citation omitted.]" 301 Kan. at 524-25.

Peterman's contention that the jury was made to believe that it had to believe in aliens to find him guilty is illogical. Instead, we are faced with a prosecutor using

19

sarcasm as rhetorical device, not an analogy, as the reference to aliens certainly has no similarity to the facts of the case.

> "Because the line between appropriate and inappropriate use of sarcasm is thin, making it easy to cross, prosecutors should avoid repeated use of the technique in most cases. And its occasional use can be 'no more than sarcastic hyperbole identifying what the prosecutor believe[s] to be weakness in the defense explanation of events.' [Citation omitted.] . . . Sarcasm, when appropriate, should be thoughtfully tailored to specific arguments and evidence; sarcasm should not set the tone of the prosecutor's entire argument or rebuttal." *Longoria*, 301 Kan. at 526.

In *Longoria*, the court considered whether the prosecutor's repeated ridicule of the defense through sarcasm "by using the term 'seriously' and likening defense theories to UFO's and aliens" was within the wide latitude allowed in discussing evidence. See 301 Kan. at 523-25. The court found that the prosecutor' comments were proper given that the prosecutor did not comment on facts not in evidence in conveying the weakness of the defense and had tied his sarcasm to the evidence. The court also noted that the jury had been repeatedly told of the importance of deciding the case based on the facts and that the attorneys' arguments were not evidence.

Here, the prosecutor's statements fall short of the ones in *Longoria*. The prosecutor only made a fleeting sarcastic reference to aliens during rebuttal and did not rely upon the sarcasm to distract the jury from the evidence or its charge. The prosecutor tied the sarcastic comment directly to the question of whether the jury should believe Peterman's version of events. Nor did the prosecutor use sarcasm to establish weaknesses in the defense as the prosecutor after making the comment immediately transitioned into a discussion of the evidence. The prosecutor remained within the wide latitude allowed in discussing the evidence.

20

Next, Peterman argues that the hypothetical posed in the following rebuttal improperly inflamed the passions of the jury:

"The fact is that he says, well is it possible a twelve year old or a ten year old would make this up? I supposed it's possible. It doesn't mean it's reasonable. If a ten or eleven year old was going to make this up, in your common experience, would that come out as, I'm lying on the bed, he kisses me on the cheeks, the lips, the ears, then moves down and kisses me on the vagina with my pants on until my pants are wet. Is that what you would expect if it was made up? No, you'd expect, he grabbed [my] breast, he grabbed my vagina, he put his penis in, he put his penis on me. (Emphasis added.)

Here, unlike with the sarcastic alien comments, the State properly used an analogy similar enough to the sensible limits of the facts surrounding allegations of sexual abuse to put in context the believability of Peterman's defense or closing argument that it is possible that "children fabricate or make up things like this." See *Longoria*, 301 Kan. at 524-25. The prosecutor's comment could also be construed as asking the jury to assess the credibility of the complaining witness—a key issue in the trial that the prosecutor is afforded wide latitude in addressing. See *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010).

Next, Peterman argues that the following rebuttal from the prosecutor both inflamed the passions of the jury and improperly shifted the burden of proof by admonishing the jury to believe F.W. was not confused:

"I got confused the other day. I had to drop my kids off at school. Guess what? Instead of making a left turn I make a right turn. I didn't turn around and go [to] work and say, hey, somebody licked me on the vagina with my clothes on. Confusion does not relate to making up sexual abuse. You've heard no evidence of such action. It is absurd to think she was confused so she must have just made this up. No. She had absolutely no motive, no reason to make any of this up." (Emphasis added.)

21

The State correctly points out that this comment was in rebuttal to Peterman's closing in which he suggested that F.W. made up the allegations because she was confused. Peterman argued, "[F.W.] is confused. She doesn't know—her dad—her own dad tells her if you say anything you could get it trouble. I mean, she's confused. She doesn't know what's going on. She's confused at this point." We believe that the prosecutor's use of analogies was a proper way to explain how the jury should view the evidence and assess the witness' credibility. See *Longoria*, 301 Kan. at 524-25; *Huerta-Alvarez*, 291 Kan. at 262. Moreover, the prosecutor's comment "somebody licked me on the vagina" was a fair comment on the evidence.

Peterman also faults the prosecutor for arguing:

"Sylvia DesLauriers, she didn't introduce [the] information. She wasn't even talking to her about sexual abuse. What's she talking to [F.W.] about? General therapy. The therapy that was provided because [F.W.] had to leave her parents' home. Ms. DesLauriers tells you she was upset and scared. [DesLauriers] asked [F.W.] why she was upset and scared and guess what came out? Exactly why she was upset and scared. Because a grown forty year old man had licked her on the vagina with her clothes on."

Peterman argues that the prosecutor misled the jury by stating that F.W. was not speaking with DesLauriers about sexual abuse when she mentioned Peterman. Peterman asserts that F.W. was, in fact, speaking with Deslauriers about sexual abuse when she mentioned her nightmare involving, albeit sexual abuse F.W. suffered from her uncle.

We believe that the prosecutor made a reasonable inference about the subject matter of F.W. and DesLauriers' conversation based on F.W.'s testimony. F.W. testified that before she disclosed the information about the nightmare and Peterman, DesLauriers had asked her "if anything ever first happened to [her] with [her] uncle" before asking her if "anything happened again with anybody." While the prosecutor's comment did not reference DesLauriers as the source of the nature of the conversation prior to the

22

disclosure, DesLauriers nevertheless contradicted F.W.'s testimony when she testified that F.W.'s disclosure about Peterman was not "in response to a question that even related to sexual abuse." Moreover, both F.W. and DesLauriers testified that the purpose of the therapy DesLauriers provided to F.W. was only related to the required therapy for foster care. Accordingly, the prosecutor did not argue facts not in evidence and made a reasonable inference based upon the evidence. See *Tahah*, 293 Kan. at 277.

Finally, Peterman argues that the prosecutor's comment, "In this world [it's] criminal activity that requires you to find him guilty," was an improper statement regarding the duty of the jury. Telling jurors that a defendant's conduct requires the jury to find the defendant guilty can certainly be construed as a statement implying to the jurors that their oath requires a guilty verdict, which is the type of comment that was disapproved of in *State v. Scott*, 286 Kan. 54, 79, 183 P.3d 801 (2008).

> "By telling jurors to honor their oath and return a verdict of guilty, the prosecutor implied that to do otherwise would be a violation of duty. Such comments have been found to be improper by a variety of courts. [Citations omitted] . . . [I]t generally is improper for the state to argue that the jurors' oath obligates them to return a particular verdict because such language poses a risk of diverting the jury from its duty of deciding the case on the basis of the evidence and the applicable law.'" 286 Kan. at 79.

However, the prosecutor here did not specifically mention the juror's oath. Moreover, when the prosecutor's comment is taken as a whole it does not suffer from the same defect as the statement in *Scott*, 286 Kan. at 79. Unlike the present case, the prosecutor in *Scott* made the questionable comments without any reference to the evidence. Here, however, the prosecutors' comment was the final remark made during a discussion of whether the evidence presented met the definition of lewd fondling set forth in Instruction No. 8. And, the prosecutor argued during closing argument that the jury should find Peterman guilty after it went back and examined all of the evidence. Hence,

23

we do not find the prosecutor's comment to be improper under the circumstances presented.

*Judicial Misconduct*

In his pro se brief, Peterman also challenges two of the district court's rulings overruling his objections to a question that the State posed to both F.W. and Copeland. Peterman also takes issue with the State's cross-examination of him. Peterman did not argue below and does not argue now that recusal was required. See *State v. Sawyer*, 297 Kan. 902, 905-06, 305 P.3d 608 (2013) (discussing the three substantive bases on which a litigant may argue that a judge's recusal is required). Instead, Peterman makes the genial statement that he did not receive a fair trial. An allegation of judicial misconduct is reviewable on appeal despite the lack of a contemporaneous objection when the defendant claims that his or her right to a fair trial was violated. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010).

Appellate courts have unlimited review over allegations of judicial misconduct. *Kemble*, 291 Kan. at 113. Peterman, as the party alleging judicial misconduct, bears the burden of showing his substantial rights were prejudiced. See *State v. Hudgins*, 301 Kan. 629, 637-38, 346 P.3d 1062 (2015). If a proper and reasonable construction of the alleged judicial misconduct will render the conduct unobjectionable, it is not prejudicial. 301 Kan. at 638. The mere possibility of prejudice from a judge's remark is insufficient to overturn a verdict. *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002).

First, Peterman takes issue with the district court overruling an "asked and answered" objection when the State asked F.W., "Now, this first time that he licked your lower private area. Where did—what room in his house did that occur?" Peterman, without explaining why, claims that the district court's ruling was improper because four questions earlier, the State asked F.W., "And where were you when that occurred?" F.W.

24

responded, "His bedroom." Peterman appears to be arguing the district should have ruled that the State's subsequent question was cumulative. However, the transcript reflects that the earlier question and response concerned the kissing incident in October 2010 rather than the first incident during which Peterman licked F.W. Thus, the district court's ruling on this objection was not improper.

Next, Peterman faults the judge for overruling his counsel's objection to Copeland's response to the State's question about whether she was observing a "father/daughter relationship or a boyfriend/girlfriend relationship." When asked this question, Copeland responded, "It was more boyfriend/girlfriend. If there had not been a divider or armrest—." At this point, Peterman's counsel objected, arguing that any answer would be speculation. The district court overruled the objection. Copeland finished her answer, stating, "If there had not been an armrest in between these two people there would have been no division."

Peterman argues that Copeland's response "made it sound as if something heinous was only prevented by an armrest in a public theater." However, Copeland's testimony regarding the armrest is not speculative as it concerns her direct observations describing how physically close Peterman and F.W. were situated throughout the play. This is reflected in the exchange directly after her response when the State then asked Copeland, "Okay. They were extremely close to one another throughout the play?" To which Copeland responded, "Yes." Thus, the basis of Copeland's answer was more than a mere opinion or conjecture and was based on her observations.

Lastly, Peterman argues that the district court improperly allowed the State to unfairly badger him during cross-examination about whether he had asked F.W. to marry him and to explain why Peterman viewed him asking F.W. to do so was a joke. The prosecution is permitted to cross-examine defense witnesses as to relevant facts that the witness discussed during direct examination. Other than appearing to resent having to

25

answer the State's questions, Peterman points to no specific questions posed by the State that did not focus on facts brought out during direct examination. In summary, we can find nothing in the record that amounted to the badgering of Peterman.

*Imposition of Lifetime Electronic Monitoring*

As indicated above, the State concedes that the district court did not have authority to impose the lifetime electronic monitoring under K.S.A. 2012 Supp. 21-6604(r) in this case. This is because Kansas statutes did not authorize a district court to impose lifetime electronic monitoring at the time Peterman committed the crimes for which he was convicted. Specifically, Peterman committed three off-grid aggravated indecent liberties with a child sometime between August 2010 and April 2012. But K.S.A. 2012 Supp. 21-6604(r) did not take effect until July 1, 2012. Thus, we vacate this portion of Peterman's sentence.

Affirmed in part and vacated in part.